SOUTHERN PACIFIC COMPANY, PLAINTIFF-APPELLANT,
v. WHEATON BRASS WORKS, A CORPORATION OF THE
STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued November 20, 1950—Decided December 4, 1950.

*Mr. Richard F. Green* argued the cause for the appellant.

*Mr. Roy C. Collins* argued the cause for the respondent.

The opinion of the court was delivered by

BURLING, J.  This is an appeal by the plaintiff from a judgment of the Essex County District Court in favor of the defendant.  The case was submitted to the District Court upon the pleadings and an agreed state of facts and briefs. The notice of appeal is addressed to the Superior Court, Appellate Division, but has been certified on our own motion.

The only issue involved is one of law.  The question to be determined is whether a common carrier may, under the Interstate Commerce Act, recover from a consignee the balance of the freight charges on an interstate shipment where the consignor misdescribed the goods in a bill of lading and prepaid the freight at a lower rate than that provided in the filed tariffs for the goods actually shipped, the consignee having refused to accept the shipment until assured that the freight was prepaid, and having changed his position in reliance on such representation.

The pertinent facts, as they appear in the stipulation of the parties, are that on May 16, 1947, the defendant entered into a contract with Bernard Pipe Supply, of Los Angeles, California, for the purchase of 291 boxes of loading assem-

blies, by the terms of which contract the seller was to prepay the shipping charges. On or about June 1, 1947, the Officer in Charge, Construction Battalion Center, Port Hueneme, California, as agent of the seller, delivered the said assemblies to the plaintiff's agent at Oxnard, California, for shipment to the defendant, at Newark, New Jersey. The assemblies were described in the bill of lading as "291 BXS Pipe Fittings, NOIBN, I/S." The abbreviation "I/S" is accepted among carriers as meaning "Iron and Steel." The shipment actually consisted of iron and steel pipe with fittings and brass valves. The shipper's agent prepaid the plaintiff's agent charges of $1,082.42 on the basis of tariffs and schedules of the Interstate Commerce Commission applicable to shipments of iron and steel. The defendant received from the seller an invoice for the price of the goods which indicated that the shipping charges had been prepaid. Enclosed with the invoice was a uniform straight bill of lading indicating that the freight charges were to be collected from the consignee. The defendant also received a notice from the Pennsylvania Railroad Co., the terminal carrier, indicating that the goods had arrived at its Newark freight station and that the freight charges had been prepaid. In view of the conflicting statements on the invoice, the arrival notice and the bill of lading the defendant contacted the Pennsylvania Railroad Co., advising that it did not wish to accept the goods until it knew whether there were any shipping charges payable, and being informed that the shipping charges had been fully prepaid, accepted the goods and paid the shipper the full contract price therefor. At the time of such acceptance the defendant knew that the shipment consisted partly of brass but did not know the meaning of the abbreviation "I/S" on the bill of lading. Approximately 18 months after the acceptance of delivery by the defendant, and after substantially all of the goods had been resold, a representative of the Pennsylvania Railroad Co. discussed the shipment with the defendant, and, upon being apprised of the nature of the goods, informed the defendant that the goods had been improperly classified by the

shipper as a result of which additional freight charges were due. The defendant informed said representative that any unpaid freight charges would have to be collected by the railroad from the shipper as under the defendant's contract with the shipper the latter was liable therefor. The plaintiff has made no effort to collect the unpaid balance of the shipping charges from the shipper, which is still in business and solvent, but instituted the present suit on June 16, 1949, against the defendant to collect such unpaid charges in the amount of $738.37. The Essex County District Court decided that under the foregoing facts the defendant was under no liability to the plaintiff and judgment in favor of the defendant was accordingly entered on March 10, 1950. The present appeal is from that judgment.

██ The shipment giving rise to the present controversy is of an interstate nature and a determination of the question involved requires a consideration of the applicable provisions of the Interstate Commerce Act as construed by the federal courts whose decisions on federal problems are controlling. The pertinent provisions of the Interstate Commerce Act are contained in Title 49, *U. S. C. A.*, § 6, *par.* (7) (*Act February* 7, 1887, c. 104, § 6, *par.* 4, 24 *Stat.* 381, as amended *Act March* 2, 1889, c. 382, § 1, *pars.* 4, 7, 25 *Stat.* 856, 857, *Act June* 29, 1906, c. 3591, § 2, § 6, *par.* 6, 34 *Stat.* 587, *Act February* 28, 1920, c. 91, § 411, § 6, *par.* 7, 41 *Stat.* 483), as follows:

"No carrier * * * shall engage * * * in the transportation of property * * * unless the rates * * * and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of * * * property * * * between the points named in such tariffs than the rates * * * and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates * * * and charges so specified * * *."

The foregoing section of the Act has been construed on numerous occasions by the federal courts and it has become

well settled that the purpose of the act is to prevent prefer-
ences and to enforce compliance with the requirements of
the pertinent paragraph that a carrier shall not charge less
than the rates specified in his filed schedules, and that it is the
right and duty of the carrier to collect the full tariff charges
for freight delivered.  Nor can any act or omission on the
part of the carrier, except the running of the statute of limi-
tations, estop or preclude the carrier from recovering the
full amount of the proper charges from a person liable there-
for, the parties to the consignment being, as a matter of law,
charged with the proper schedule rates.  See annotation, *Title*
49, *U. S. C. A.,* § 6, *par.* (7), *p.* 284.  One of objectives of
the act is to prevent discrimination by carriers in their rates
in favor of preferred shippers and to stabilize rates beyond
the control of the carrier and the persons liable therefor.
Failure by a carrier to collect the proper charges cannot re-
lease a person liable therefor as this would circumvent the
purpose of the act and be in defiance of its provision for-
bidding a remission "in any manner or by any device any
portion of the rates  *  *  *  and charges so specified."  The
application of the act, as construed by the courts, leads occa-
sionally to a seemingly harsh result as is alluded to in *Pitts-
burgh, C. C. & St. L. R. Co. v. Fink,* 250 *U. S.* 577, 63 *L. Ed.*
1151 (1919), a leading case on the subject.  In that case, a
carrier delivered merchandise to the consignee, one Fink,
upon payment by the latter of the sum of $15, being the
amount specified in the waybill.  The filed tariff rates so
classified the merchandise that the charges should have been
$30.  Suit was instituted by the carrier for the difference and
recovery was allowed.  The rule was stated by Mr. Justice
Day as follows:

"*  *  *  The statute made it unlawful for the carrier to receive
compensation less than the sum fixed by the tariff rates duly filed.
Fink, as well as the carrier, must be presumed to know the law, and
to have understood that the rate charged could lawfully be only the
one fixed by the tariff.  When the carrier turned over the goods to
Fink upon a mistaken understanding of the rate legally chargeable,
both it and the consignee undoubtedly acted upon the belief that the

charges collected were those authorized by law. Under such circumstances, consistently with the provisions of the Interstate Commerce Act, the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. *Texas & P. R. Co. v. Mugg & Dryden*, 202 *U. S.* 242, 50 *L. Ed.* 1011, 26 *Sup. Ct. Rep.* 628. The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. This may be in the present as well as some other cases a hardship upon the consignee, due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation."

It was further decided in the *Fink case* that the defendant could not invoke the principle of estoppel against the carrier's right to collect the legal rate as "Estoppel could not become the means of successfully avoiding the requirement of the act as to equal rates, in violation of the provisions of the statute." In *Scott Paper Co. v. Marccalus Mfg. Co.*, 326 *U. S.* 249, 90 *L. Ed.* 47, 52 (1945), in referring to the doctrine of estoppel, Mr. Chief Justice Stone cited the *Fink case* and said:

"For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest."

The principle fixing the liability of the consignee, as established in the *Fink case, supra,* has been followed by numerous federal and state courts, including the courts of this State. Some of the many federal cases following the established rule are *Louisville & N. R. Co. v. Central Iron & Coal Co.*, 265 *U. S.* 59, 68 *L. Ed.* 900 (1924); *Illinois Steel Co. v. Baltimore & Ohio R. Co.*, 320 *U. S.* 508, 88 *L. Ed.* 259 (1944); *Central Warehouse Co. v. Chicago, R. I. & P. Ry. Co.*, 14 *F.* 2d 123 (*D. C. Minn.*); affirmed, 20 *F.* 2d 828 (*C. C. A. 8th Circuit* 1927); *F. Burkhart Mfg. Co. v. Fort Worth & D. C. Ry. Co.*, 149 *F.* 2d 909 (*C. C. A. 8th Circuit*

1945); *Great Northern Ry. Co. v. Hyder,* 279 *F.* 783 (*D. C. W. D. Wash. S. D.* 1922); *Western & Atlantic R. Co. v. Underwood,* 281 *F.* 891 (*D. C. N. D. Ga.* 1922). The cases in New Jersey following the principle so established are *West Jersey, etc., Co. v. Lake & Risley Co.,* 105 *N. J. L.* 314 (*Sup. Ct.* 1929); *Atlantic City R. R. Co. v. Packman,* 7 *N. J. Misc.* 945 (*Sup. Ct.* 1929); *N. Y. Central R. R. Co. v. Stanziale,* 105 *N. J. L.* 593 (*E. & A.* 1929). See also *New York, N. H. & H. R. Co. v. Lord & Spencer, Inc.,* 273 *Mass.* 583, 174 *N. E.* 179 (*Sup. Jud. Ct.* 1931); 13 *C. J. S., Carriers,* § 393, *p.* 873; 9 *Am. Jur., Carriers,* § 624, *p.* 794; 83 *A. L. R.* 249. The rule was recognized in *Lowden v. Simonds-Shields-Lonsdale Grain Co.,* 306 *U. S.* 516, 83 *L. Ed.* 953, 957 (1939), rehearing denied, where the court gave expression to a reason for the seemingly harsh rule by saying:

"* * * This Court has had occasion recently to sustain action of the Commission aimed at carriers' practices resulting in collection of less than the tariff rate. It is equally important to aid the efforts of a carrier in collecting published charges in full. Involuntary rebates from tariff rates should be reviewed with the same disapproval as voluntary rebates."

The defendant contends that its liability must be predicated on a contract to pay the shipping charges and that since in the present case the defendant consignee had informed the carrier, prior to acceptance of the goods by the defendant, that the shipping charges were to be paid by the shipper and that it, the defendant consignee, would not assume liability therefor there was no contract by the defendant to pay the charges and hence no liability on its part. It is said that while in the *Fink case, supra,* the consignee paid less than the proper charges at the time the goods were delivered, the defendant herein refused to accept delivery until assured that all charges had been prepaid. But this would seem to be immaterial in view of the rule as stated in the *Fink case, supra,* and so often followed by the courts, as earlier indicated herein. In *Great Northern Ry. Co. v. Hyder, supra,* the fol-

lowing question was presented for determination: "Can a consignee, who is not at any time the owner of the goods shipped, who has not agreed with either the shipper or the carrier that he will pay the freight, who accepts the goods upon the carrier's representation that the freight has been prepaid, be bound by such acceptance to pay the freight?" The court answered the question in the affirmative, saying:

"* * * If the doctrine of estoppel cannot be invoked where the consignee paid the demanded rate, thinking it was the filed and posted rate, the carrier thereby losing its lien for the unpaid portion of the freight, it is not perceived why the consignee, in receiving the goods, acting under a mistaken belief that the shipper had fully paid the freight, can do so * * *."

and further saying:

"* * * The shipper, the carrier, and the consignee are all agents and trustees for the public, and no complications arising out of the agreements between them, or shuffling, should defeat the purpose of the act requiring the full and exact payment of the freight as fixed by the filed, posted and published tariff."

A similar result was reached in *Western & Atlantic R. Co. v. Underwood, supra,* wherein the court used the following cogent language:

"* * * That the consignee cannot accept delivery without incurring liability for the carrier's charges, known or unknown, supposed to be prepaid or otherwise, and no matter what the consignee's actual relation to the shipper is, appears a harsh rule, but is seemingly established by authority. If by the shipper's omission the consignee is thus made liable for a charge which as between him and the shipper should not be borne by him his recourse is on the shipper. The carrier is not bound by their private rights in the transaction, whether known or unknown to it, nor by any mistake or misrepresentation occurring, but under the law may look to the shipper as the original contractor to pay and to the person who as consignee accepts the gooods and becomes by statute liable to discharge the lien thereon until the lawful charges are satisfied."

The defendant seeks support for its position in the cases of *Louisville & N. R. Co. v. Central Iron & Coal Co., supra;*

*Central R. R. Co. v. MacCartney,* 68 *N. J. L.* 165 (*Sup. Ct.* 1902), and *Penna. R. R. Co. v. Townsend,* 90 *N. J. L.* 75 (*Sup. Ct.* 1917). The two New Jersey cases are not helpful to the defendant. Our former Supreme Court, in 1929, in *West Jersey, etc., Co. v. Lake & Risley Co., supra,* followed the rule of the *Fink case,* and referred specifically to the *MacCartney* and *Townsend cases* as follows:

"The cases cited were, however, dealing solely with the common law liability and none other. There is no reference to any statutory authority, nor, so far as appears, was the act of Congress called to the court's attention. Plaintiff in the present cases bases its right to recover not on the common law but on the act of Congress of February 4th, 1887, known as the Interstate Commerce Act, and its amendments.

"The question before us is, therefore, a federal and not a state problem, and is controlled by the decisions of the federal courts which as we think have ruled adversely to the respondent's contention."

We find nothing in *Louisville & N. R. Co. v. Central Iron & Coal Co., supra,* to support the defendant's position. That case involved a suit by the carrier against the shipper for the difference between the amount of charges originally incorrectly computed and paid by the consignee and the proper amount which was legally payable. The bill of lading in that case, as here, stated that the charges should be paid by the consignee. The court considered the bill of lading as the contract and decided that the *shipper* was not liable and that action should have been brought against the consignee. Mr. Justice Brandeis, speaking for the court, said that the Interstate Commerce Act did not impose an absolute obligation upon a *shipper* to pay the freight charges, and that the carrier and *shipper* "were left free to contract, subject to the rule which prohibits discrimination." But in concluding his opinion, Mr. Justice Brandeis said:

"For, under the rule of the Fink case, if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. His liability satisfies the requirements of the Interstate Commerce Act."

604

The rule of the foregoing case appears to be that while the shipper has some latitude in limiting his liability by his contractual undertaking, "if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges." The *Central Iron & Coal Co.* case has been subsequently construed by the federal courts to impose an absolute liability on the consignee resulting from the acceptance of the goods. *Central Warehouse Co. v. Chicago, R. I. & P. Ry. Co. (C. C. A. 8th Circuit* 1927), *supra; F. Burkhart Mfg. Co.. v. Fort Worth & D. C. Ry. Co. (C. C. A. 8th Circuit* 1945), *supra.*

The judgment is reversed and the trial court is directed to enter judgment for the plaintiff in the amount of its claim, together with lawful interest thereon from the date of acceptance of delivery.

*For reversal*—Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—Chief Justice VANDERBILT, and Justice WACHENFELD—2.