## Southern Pacific Co. v. Valley Frosted Foods Co.

*Brockway, Acker & McKay*, for plaintiff.
*Wiesen, Cusick & Madden*, for defendant.

RODGERS, P. J., January 27, 1955.—This matter comes before the court to be heard de novo on an appeal from an award of the board of arbitration. The trial there resulted in a verdict in favor of appellant in the amount of $169.23. The total amount claimed by appellant is $556.04. The parties have waived their right to a court en banc and have stipulated the facts. These facts are that on May 2, 1949, the Star Food Products Company of Portland, Ore., shipped by plaintiff lines certain strawberries under a bill of lading marked "to be prepaid", consigned to and duly received by the Valley Frosted Foods Company of Farrell, Pa. The invoice covering the produce and the freight thereon, together with a sight draft and the above-mentioned bill of lading, were forwarded to the First National Bank of Sharon, Pa. Upon notification by the First National Bank that they were holding for collection a bill of lading draft drawn upon the Star Food Products Company, and relying upon the representation in the bill of lading that the freight charges were to have been prepaid, the Valley Frosted Foods Company, defendant, paid the amount of the sight draft, including the freight charges, in full on May 18, 1949, 16 days after the produce had been received by appellant from the consignor. The Interstate Commerce Commission tariff rate for the produce delivered is $556.04. Under the ICC regulations the carrier is not permitted to deliver freight to the consignee until the freight charges have been paid, except that the carrier may under certain circumstances extend credit to the consignor upon

a prepaid shipment for a period not to exceed 96 hours after the goods are received for shipment.

On June 2, 1949, the consignor filed a voluntary petition in bankruptcy and was subsequently adjudicated bankrupt, appellant having failed to collect any part of the freight charges for which this action is brought. On February 6th appellant demanded payment of these charges from defendant, which defendant has refused to pay.

Appellant alleges that while they have erred in forwarding the bill of lading marked "to be prepaid" without actually having demanded prepayment or collected within the 96 hours' grace period, and while this action has misled defendant to his damage, nevertheless, they bring this action not so much because they want to, but because they must on the theory that the ICC rule against the granting of preferences is applicable to this situation. They come before the court and say: "We have made a mistake; we have made a contract with you; we have breached that contract; this breach has damaged you but you must pay again". In fact, they come before the court and say this is a case in which the equities of the matter cannot be considered. Any time a litigant appears before this or any other court with such a proposition, they must be absolutely certain of two things. First, that there is a binding precedent which inhibits the court from examining the equities of the case, and second, that the overpowering public policy requiring the strict application of the law is actually involved in the case.

What is the public policy involved? Simply stated: "The purpose of the act is to prevent preferences": Southern Pacific Company v. Wheaton Brass Works, 5 N. J. 594, 76 A. 2d 890, 892 (certiorari denied, 341 U. S. 904). It is perfectly clear that the compulsion on the part of the carrier to collect the full tariff charges

for goods delivered is to enforce the prohibition against preferences.

In the rate cases, that is, where for one reason or another the full rate or tariff has not been charged, the rule is clear and unrelenting that nothing will prevent the collection of the full and proper rate from the consignee, and this is true even where the consignee has refused to accept the goods until assured by the shipper that the freight was prepaid, and thereafter, changes his position in reliance on the shipper's representation that it was. The doctrine of estoppel does not help the consignee in such a case, for as Chief Justice Stone said in Scott Paper Company v. Marcalus Mfg. Co., Inc., et al., 326 U. S. 249:

"For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest."

This public interest is, of course, in the prevention of preferences.

Our question is: Does this principle apply where defendant has already paid the full tariff upon the representation that the shipment was prepaid, which on the stipulation of facts, is our case. We believe that the principle does not apply and that the public policy against preferences is not involved for the very simple reason that the stipulation of facts sets out that this defendant in fact received no preference, but actually has once paid in full the charges required by the tariffs.

The preference here was given to the consignor, not to the consignee.

Both our Supreme Court and the Supreme Court of the United States have indicated that where the public policy is protected, the carrier cannot hide behind the Interstate Commerce Commission regulations to cover his own mistakes.

The New York Central v. Berry case, 338 Pa. 500, was basically a matter of proving the correct rate, but the second question involved was that of the liability of the consignor for the payment of freight charges where the shipper had allegedly granted an unreasonable credit period to the consignee. The form of the shipping contract used provided space for the entry of a stipulation requiring the shipper to collect before delivery to the consignee, but this section was not used. The Supreme Court held that under those circumstances defendant consignor was liable, but very definitely indicated that a different contract actually proved by the parties would be enforced by the court.

In the case of Fullerton Lumber Company v. Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 282 U. S. 520, the carrier had accepted a check in payment of charges and then delayed for an unjustifiable length of time in presenting it. The bank failed and defendant consignee suffered a loss and was called upon to pay again. The lower court ruled that since the Interstate Commerce Commission rules required payment in cash that the consignee was liable to pay again.

The Supreme Court said at page 521:

"The purpose of the requirement" to pay in money "is solely to prevent rebates or unjust discrimination and to ensure observance of the tariff rates".

The court held that the use of checks was a proper trade custom and said:

"Whether in the case at bar the defendant is liable depends, not upon any provision of the Interstate Commerce Act, but upon the rules of law generally applicable to payment by check."

In Davis, Director General, v. Akron Feed and Milling Company, 296 Fed. 675, it was held that where wheat was sold to defendant f. o. b. cars in defendant's city and the carrier erroneously told defendant that

the freight had been paid to a certain specified point, and defendant paid the freight charges from that point, and paid the seller the balance of the purchase price after deducting the freight paid, the carrier is estopped from demanding further payment of freight by defendant.

We understand that the Davis case has been criticized in opinions of other courts, but it has never been overruled, and we believe that it presents a more reasonable holding, especially where, as in our case, defendant consignee has already paid in full for the freight charges to this shipment, thus eliminating the question of preference. In the Davis case the court said:

"The law is well settled that representations or claims made by the carrier as to the correct amount of freight to be charged will not relieve a consignee from the payment of the scheduled rate, for the reason that a shipper or consignee has equal opportunity with a carrier to know the published rate, and he is conclusively presumed to have such knowledge.

"The question here presented, in the absence of any claim or proof of fraud and collusion, must be determined upon wholly different considerations. The consignee in this case had no knowledge, nor had it equal means with the railway company of acquiring knowledge, that the freight from Kansas City to Chicago had not been paid. . . .

"The consignee, at the time these representations were made to it, was in position to protect itself fully in the payment of all freight charges. It was wholly a matter of indifference to it whether these charges were $100 or $200. Whatever freight charges it was required to pay it could deduct from the purchase price of the merchandise. It is admitted that, if it is now compelled to pay this freight, it cannot recover the same from the consignor and must suffer the loss. . . .

While the statute requiring every shipper and consignee of freight to pay the full published scheduled rate is a salutary one for the protection of the public, nevertheless, in construing and enforcing the statute, courts should not wholly ignore private rights. It is equally important that the rights of private individuals should be protected.

". . . the equities are clearly with the consignee, and we are not impressed that the public interest demands such construction of the law as would make the consignee suffer a loss due to the fault, negligence and misrepresentations of the carrier."

Subscribing to these views and believing that on the facts of this case no inroads are made on the established public policy against the granting of preferences, we hold that plaintiff is estopped by its conduct from making any successful claim on defendant.

### Order

And now, January 27, 1955, judgment is entered for defendant.