**METRO SHIPPERS, INC., Plaintiff,**

v.

**LIFE SAVERS, INC., Defendant.**

**Civ. No. 80–989.**

United States District Court,
D. New Jersey.

July 25, 1980.
Supplemental Opinion Sept. 8, 1980.

Thomas F. X. Foley, Colts Neck, N. J., for plaintiff.

Edward G. Beimfohr by Edward C. Cerny, Bernardsville, N. J., and Paul M. Antinori, Teaneck, N. J., for defendant.

Memorandum

BIUNNO, District Judge.

Metro, a "shipper's agent", sues Life Savers for the unpaid balance of invoices submitted by Metro to Sentinel Shippers, Inc., a non-profit California corporation formed in 1976 to serve its members in consolidating or distributing freight for them (and not for others) in order to secure the benefits of carload, truckload or other volume rates from common carriers.

Acting in that capacity, Sentinel was exempted from I.C.C. regulation under those provisions of the statute and regulations applicable to "freight forwarders" who hold themselves out to the general public. This was by virtue of 49 U.S.C. § 1002(c)(1), now revised as 49 U.S.C. § 10562(3).

Although not employed as such in the statute, the common term for an entity such as Sentinel is a "non-profit shippers' association." Although there seems to have been a question at one time whether such a group could function in corporate form, it has long been recognized that the legal structure taken by the group does not, as such, control the question of exemption. It may be an ordinary unincorporated association, a partnership, a joint venture or a corporation. What is controlling is that the entity, whatever its form, be a group of shippers, that it be not for profit, and that its operations be for the purpose of securing for the member shippers the benefits of carload, truckload, or other [common carrier] volume rates by the consolidation or distribution of freight of the members, as distinguished from the general public. These features explicitly recognize the difference between shippers' associations and freight forwarders. See *Columbia Shippers, etc. v. U. S.*, 301 F.Supp. 310, at 312 (D.Del., 1969, 3-judge court).

The fact that freight shipped by the carload, truckload, or in volume is less costly per unit of goods shipped, under traditional common carrier published tariffs is well-known and needs no elaboration here. See *Columbia Shippers, supra*, at p. 312, footnote 2 for a common example.

Life Savers was not a charter member of Sentinel. It became interested in possible membership during the gasoline shortage of 1979, combined with a strike of owner-operators of tractor/trailers, as testified to by Mr. McDuffee in his deposition. Presumably, it had theretofore handled its freight through the services of such owner-operators. In conversation with a manufacturer of confectionary products faced with similar shipping problems, Mr. McDuffee learned of the existence of Sentinel, which was recommended. He spoke to a Sentinel representative by phone, discussed origin and destination points, rates and the like, and was sent some materials. These were Deposition Exhibits 8 and 9, being a letter of March 22, 1979 with the names of four suggested draymen (to handle shipments to and from railheads at various locations), a

list of members of Sentinel (including such shippers of freight as Fleischmans Distilling, Heublein Corp., Kaiser Aluminum & Chemical, Nestle's Corp., Pacific Electric, Skil Corp., Standard Brands, F. W. Woolworth and J. M. Schmucker's), an opinion letter (dated May 18, 1977) from general counsel for Sentinel outlining material to answer questions most often asked by shipper-members and their house counsel, a note that the $50. application fee was waived, a copy of the certificate of incorporation of Sentinel, and a form of application for membership.

Mr. McDuffee filled out the application (Exh. 9), attached a sheet of approximate monthly tonnage from three points of origin to two points of destination, and sent it in. Rates quoted by Sentinel are Exhibit 14, these being Mailgrams dated 3/20/79 and 5/20/79.

Some shipments were sent through Sentinel on a tryout basis. These were evidently handled to Life Savers' satisfaction, and the use of Sentinel's services was increased.

At first, Sentinel was paid by check on receipt of invoices. Later, because Life Savers' general volume of checks (not only for Sentinel) is high, Sentinel was placed on a sight draft basis, being supplied with drafts for presentation with specified supporting documentation attached. See Exh. 12.

Under date of October 30, 1979 (Exhibit 10), Sentinel wrote Life Savers in connection with the annual meeting of members set for November 14, 1979, enclosing a ballot to vote for directors, a copy of the by-laws, and an invitation to attend the annual meeting and dinner, at which the annual report for 1978–1979 would be given. The ballot was not returned, and no arrangements were made to have someone attend the meeting on behalf of Life Savers.

It appears that a number of movements were involved in a shipment from, say, New York to California. First, a drayman would move the goods by tractor/trailer from factory in New York to a railyard where it was

to be combined with other shipments from New York to Chicago. Next, it would move by Conrail from New York to Chicago as part of a volume shipment. At Chicago, draymen would transfer the trailers across the city to a western railroad. Then it would be combined into a volume shipment by rail from Chicago to California. Finally, a drayman picked up the trailer at the yard and delivered it to destination.

Sentinel engaged the services of Metro, a shipper's agent also exempt from regulation [49 U.S.C. § 1002(c)(2), now revised as 49 U.S.C. § 10562(4)]. In this capacity, Metro paid Conrail (New York to Chicago) or Atcheson, Topeka & Santa Fe (Chicago to West Coast) as rail carriers, as well as draymen moving trailers between the Conrail and ATSF yards in the Chicago terminal area, and billed Sentinel.

As required by 49 C.F.R. § 1320.1, the name of Life Savers was provided by Sentinel as the beneficial owner of all goods shipped by Life Savers through Sentinel.

In effect, then, Sentinel had an open account with Metro on which it received bills and invoices. The documentation affecting the Life Saver shipments with which this case is concerned is presented in three bulky volumes of exhibits, verified by the motion affidavits of Whiteside and Saviello on behalf of Metro.

This documentation is not in dispute. Life Savers does present after-the-fact analyses of amounts, through the affidavit of McDuffee and also in his deposition, suggesting that Sentinel's aggregate charges to Life Savers amounted to more than Metro's billings to Sentinel, and that Metro's billings to Sentinel (one instance is selected) were for more than it paid to others (rail carriers, draymen) plus the consolidation charge of $50. per trailer.

These materials, however, do not amount to raising a genuine issue of a material fact on the amount claimed. Neither Sentinel nor Metro could possibly function, even on a break-even basis, unless revenues were enough to cover direct out-of-pocket expense plus overhead for operation and fixed costs. Since both Sentinel and Metro were exempt from regulation, they were free to make charges without being limited to filed tariffs of their own. McDuffee's testimony at deposition, despite the criticism in his affidavit, is that Life Savers' coast-to-coast shipment expense through this arrangement was some $200. per trailer less than it would otherwise have been.

■ Thus, the issue on Metro's motion for summary judgment is not the amounts of the unpaid billings, but the issue of Life Savers' obligation to pay Metro.

In this respect, there is no genuine issue of material fact, and Metro has shown its entitlement to payment as a matter of law.

As a shippers' association, Sentinel could act only as the agent of such members as used its services for freight shipments in order to gain the advantage of consolidation and pooling of freight at volume rates.

Thus, Sentinel could not act on its own account. It could act solely and exclusively as agent for its members who were the principals on each of their shipments, a fact underscored by the I.C.C. required designation of the beneficial owner of the goods. There is no issue raised here that the charges on a given shipment were due to freight of some member other than Life Savers. The claim made is for billings to Sentinel on account of Life Savers' shipments only.

For purposes of the motion, Life Savers' assertion that it paid Sentinel by check, as billed, at the start of the relationship, and by sight draft with documentation attached later on, is taken as a fact not in dispute. By one of these methods or the other, Life Savers says it paid Sentinel all but $41,513. of what it was billed, this deficit in payments being due to learning that Sentinel had made an assignment for the benefit of creditors, and that Metro had not been paid for charges on shipments in transit.

This fact provides no defense in law for Life Savers. Without regard to the subjective understanding of Mr. McDuffee, Sentinel could act only as Life Savers' agent on its shipments, and so Life Savers is bound

by Sentinel's contract to pay Metro for shipments handled on Life Savers' account. The situation is no different than if a lawyer sends his office boy to the stationer to buy supplies, and gives him the money to pay for them in cash. If the office boy, with apparent authority to act, charges the purchase and pockets the cash, the employer is obliged to satisfy the unpaid stationer, and can make himself whole (if at all) by looking to his office boy.

As presented, the legal issue is whether it is sufficient for Metro to show, as it has shown without contradiction, that Sentinel was formed, organized and held itself out to be a non-profit shippers' association coming within the exemption of 49 U.S.C. § 10562(3), that Life Savers' became a member of Sentinel, that the shipments involved were shipments by Life Savers made by it through Sentinel, and that Metro has not been paid for the charges billed to Sentinel on account of these Life Savers shipments.

Metro's contention is that given this showing, Sentinel's activity for Life Saver shipments was necessarily as agent for Life Savers (in the true principal/agent sense) and not in any other capacity or for its own account, thereby binding Life Savers and obligating it to Metro with the same effect as though Life Savers had dealt directly with Metro.

Life Savers, on the other hand, contends that as a matter of law Metro may not have any recovery from Life Savers without first establishing, as a matter of fact, that Sentinel acted as Life Savers' agent in the sense mentioned, for each and every shipment in suit.

It points to decisions such as *Freight Forwarders Institute v. U. S.*, 263 F.Supp. 460 (D.N.Y., 1967) (3-judge court) for the proposition that the question whether an entity like Sentinel is in fact an exempt shippers association acting solely as agent for each member shipping goods through it depends on how the organization was operated, and whether full control of its activities was in the hands of the members.

*Freight Forwarders* was a case that began with an investigation started by the I.C.C. to determine, among other things, whether an unincorporated Florida association known as "Piggy-Back Shippers Association of Florida" (Piggy-Back) had been operating as a freight forwarder without a permit. See, e. g., 49 C.F.R. Parts 1150, 1151.

At the administrative hearing, it appeared that Piggy-Back had been organized in 1962 by one Helin, who conceived the idea of combining highway trailers on railroad flatcars for "piggyback" service, which promised economies only when there were two trailers to ship per flatcar and when the commodities were mixed. Shippers with a single trailer load could not benefit from piggyback service unless they banded together. Helin recruited the initial group of shipper members, drew articles and bylaws, called the organizational meeting, appointed the "elected" board of directors, and obtained a contract to serve as general manager at a commission of 10 cents per hundred pounds of freight handled. Thereafter, he ran the whole show without any effective control by the board (except to approve new members), and by August, 1963 had run Piggy-Back into debt of about $20,000.

The hearing examiner and Division I found these facts and concluded that during the period described, Piggy-Back was not a bona fide shippers association entitled to non-regulated status because Helin, rather than the members, exercised full control over operations.

In August, 1963 the formerly passive directors became alarmed and took action. Helin was replaced by a general manager on straight salary who could not sign checks alone. Weekly financial reports to the Board and members were required. Complete supervision and control over the manager were exercised by the Board. Modestly successful efforts to pay the association debts were begun. No freight other than that of shipper members was handled. On this state of facts, the examiner and Division I found that Piggy-Back was no longer

a "paper creature" of Helin's own conception, or a cloak under which an entrepreneur was acting, and that it had become eligible for the non-regulated status to which it was not entitled during Helin's regime.

A cease-and-desist order was entered against Helin. Beyond that the full Commission denied reconsideration, discontinued the proceedings against Piggy-Back and allowed it to continue operations.

This determination was challenged in the 3-judge court suit brought by Freight Forwarders Institute and other plaintiffs. One of the arguments made was that since the early operations under Helin were unlawful, the Commission could not "reward" Piggyback by allowing it to continue. Plaintiffs, in effect, sought a draconian rule that once a shippers association violated the Act, its operations must be stopped. The court declined to so "hamstring" the Commission in exercising its discretion to determine the appropriate remedy for past illegal activity.

A second point, namely that the Commission had failed to decide whether a non-regulated shippers association could engage in the practice of "co-loading" or "joint loading" a trailer on the same flatcar as a trailer loaded by another non-regulated shipper, resulted in a remand to the I.C.C. for further proceedings. What the outcome in that case was does not appear, but the practice was later upheld as lawful in *Columbia Shippers, etc. v. U. S.*, 301 F.Supp. 310 (D.Del., 1969) (3-judge court).

Except for one case to be mentioned later, the reports dealing with shippers associations, their characteristics, the legal requirements to be met and satisfied, the relationships between them, their members and third parties, have either been administrative decisions of I.C.C. or decisions of courts called upon to review the I.C.C. rulings.

In fact, even the classic decision that shippers associations may incorporate, the *Atlanta Shippers* case, is an I.C.C. decision, 316 I.C.C. 259 (1962) (Division I), reconsidered 322 I.C.C. 273 (1964) (full Commission).

It was in the second ruling, on reconsideration, that the Commission decided the non-regulated shipper associations could incorporate, noting that:

"... whether incorporated or not, shippers who are members of a non-regulated association are responsible as the beneficial owners of the goods moved and cannot insulate themselves in that respect from third persons . . ."

as the ruling is analyzed by the *Freight Forwarders* court, 263 F.Supp. at 465.

This history of administrative rulings and judicial decisions reviewing them indicate that inquiries into the legal status of shippers associations, to decide whether or not it is entitled to operate free of agency regulation are inquiries for the I.C.C. to conduct, either on the basis of a complaint or on its own initiative, and not for the courts in the first instance. Courts, of course, may be faced with such questions in a civil or criminal penalty proceeding under 49 U.S.C. § 11901, et seq., but inquiries directed to the determination of an association's status *de jure*, as such, are obviously for the Commission.

In a case like the present one, where the issue involves a member's own liability to a third party, whose services were engaged by the association, the showing made is sufficient to establish the association's status *de facto*, and proceed accordingly. Sentinel purported to act as a qualified shippers association and Life Savers was not only admittedly a member but directed to be made through Sentinel and as a member the shipments in suit. The *de facto* showing of Sentinel's exempt status is sufficient to invoke the principle that a shipper member who is the beneficial owner of the goods shipped through the association cannot insulate itself from responsibility to third parties, such as Metro. This is not a matter of imposing liability on a member for corporate obligations. It is a matter of holding the member responsible for its own shipments of its own freight handled on the member's account and for the member's benefit by the association which can only serve, for that purpose, as the member's

authorized agent. Each shipment, directed through the association, necessarily and inevitably is an authorization to take the steps of consolidating and otherwise gathering the freight of members to gain for them the benefits of carload lots and volume shipping.

Any other approach implies that any civil suit by a third party to recover an obligation of a member, whether it be a shipper's agent such as Metro or a common carrier, would involve a wholesale inquiry into the mode of operation of the association and the conduct of its members. Suppose, for example, that the association had once handled a freight shipment for a non-member. On a *de jure* basis, that event would disqualify the association from exempt status and provide a member with the very insulation from responsibility to third parties which the Commission and the courts have ruled members may not have.

It would provide the draconian remedy which the *Freight Forwarders* court said was a matter for Commission determination.

Not only that, but the cost and expense of such an inquiry would be faced no matter how small the amount involved. The sum in suit in the leading case of *Pittsburgh, etc. Co. v. Fink*, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919) was only $15., and the Supreme Court ruled it had to be paid. That case involved no such factual inquiry as Life Savers suggests here, fortunately.

Life Savers has made no attempt, in meeting the motion, to show anything to indicate how Sentinel was in fact operated, or tending to show that it was not an exempt association. At most, Life Savers has shown that, as a member, *it* did nothing to discharge its own obligations and duties by joining, with other members, to assure membership supervision and control. It merely sent in its membership application and then directed its freight shipments through Sentinel. When it received not one, but two notices of the annual meeting (one to Mr. McDuffee in New York and the other to Mr. Jenson in San Jose), it not only failed to have someone attend but also failed to cast its vote for directors on the ballot provided.

The deposition testimony of Mr. McDuffee discloses that when he received the opinion letter of association counsel (along with the membership application) he studied it himself but did not submit it to counsel, either outside or in-house. Aside from that, Life Savers is charged with knowledge of the law applicable to its membership. It cannot escape the consequences of shipping freight through Sentinel as a member, it cannot insulate itself from responsibility to third persons on its own shipments, by simply ignoring the matter and abandoning or neglecting or avoiding every function it had as a member other than to use the membership to ship freight and realize the saving which Mr. McDuffee estimated at $200. per trailer on a coast-to-coast shipment.

There are other implications. Should Life Savers be allowed to insist on a full blown inquiry into Sentinel's *de jure* status, and should it succeed, it will have proved that it realized itself a discriminatory rate on the shipment of single trailers at carload and volume rates to which it was not entitled. It will have proven its own violation of the Act, or at least will have exposed itself to the peril of civil or criminal penalties, or both.

The one decision, referred to above, in which a court ruled that a fact showing of the association's status is required before a third person claimant, like Metro, can recover from an association member through the principal/agent route, is *Southern Pacific etc. v. Continental Shippers, etc.*, 485 F.Supp. 1313 (D.Mo., 1980). In that case, as here, shipper members of an incorporated shippers' association were sued as principals for freight charges for the movement of their own goods when the incorporated association to which they belonged failed to pay. The association was defunct, had declared bankruptcy, and had no assets to satisfy these claims.

The issue arose because the plaintiff carriers, along with the I.C.C. (which had appeared amicus), took the position that as to

shipments of his own freight through the exempt association, each member is *per se* a principal and the organization his agent. This contention was grounded on the inherent relationship which must exist between a member and a shippers association to entitle the latter to be exempt from regulation.

As the trial court saw the issue, the long line of cases starting with *U. S. v. Pacific Coast Wholesalers*, 338 U.S. 689, 70 S.Ct. 411, 94 L.Ed. 474 (1950), and including *Atlanta Shippers Assn.*, 322 I.C.C. 273 (1969) decided no more than that *if* the facts of a particular case establish that a purported shippers association was indeed entitled to be exempt under the law, then the agency relationship would exist. Noting that there was no prior determination by I.C.C. that the defunct association was entitled to exemption, the trial court felt obliged to explore this question itself on the basis of the facts before it. Taking the evidence in the record, from depositions, exhibits and stipulations, the trial court found that the defunct association had actual authority to act for a member, was controlled by the members and did in fact act as their agent in arranging for transport for individual members. It found that the actual operation conformed to the paper form, and ordered judgment entered against the individual shipper members, as principals, for the unpaid freight charges on their own shipments.

■ With due respect, the view there expressed as to the need for a full exploration of the agency aspect as an issue of fact, contrary to the position taken by I.C.C., is not sound and will not be followed here. Given an undenied showing of *de facto* status as an exempt shippers association, as has been made here without a genuine issue of fact, a per se rule of agency should be applied in respect to the liability of a member for charges on its own shipments made through the exempt organization.

In a sense, the opinion in *Southern Pacific* is not a "holding" to the contrary, because the result reached after considering the evidence on the factual inquiry was the same as though a per se rule had been applied. In fact, the opinion discloses that the agency inquiry was a broad one, not directed to the issue of agency on an individual shipment basis, but aimed at a determination whether the overall operation of the defunct entity had been such as to bring it within the exemption. Having so found, the court evidently then applied the per se rule of agency.

The case is of interest for another reason: it illustrates the fact that financial failure of the exempt entity, including its failure and inability to pay charges due, does not imply that the defunct entity was not entitled to exemption. Whatever the reasons for the financial collapse of Continental there, or of Sentinel here, it is a fact of life that despite the most stringent supervision and control such collapses do and can occur. They may be the result of unwise management decisions, or of inability to foretell the future, or even of consummate skill on the part of a dishonest employee. It has happened with the best. Those with long memories (going back to the 1930's) will remember the swindle of McKesson & Robbins, by its president, F. Donald Coster, to the great embarrassment of Price, Waterhouse & Co., whose audits failed to discover that the Canadian warehouses shown in company records, and the fictitious inventory reported to be stored in them, did not exist. The Equity Funding swindle is a more recent example, using the modern, sophisticated techniques of computer fraud.

As this court sees it, the liability of shipper members, as principals, for charges incurred on their behalf for their own shipments made through a *de facto* shipper's association cannot be made to turn on such inquiries.

There are many reasons to support this view. Congress has made it federal policy to exempt shippers associations from the regulation imposed on freight forwarders serving the general public for profit. Due to the statutory exemption, the I.C.C. regulations in 49 C.F.R. may be searched in vain for any suggestion that such associations are even so much as obliged to identify

themselves, as by some simple registration system, so that third persons doing business with them can have a place to look to see if they are listed. Nor is there any official source for learning who their members are. About all a third person is likely to receive is the word of the association that it is exempt, and shipping documents identifying someone as the beneficial owner of the goods and so presumably a member, and even that only as an incident to regulations in respect to credit.

The shipper member, on the other hand, given the kind of properly drafted certificate of incorporation and by-laws in evidence here, which specify the purpose to be the activity which is exempt under the statute and which calls for distribution of savings realized to the members, is in the best position to inquire into the *de jure* status and factual pattern of operation.

It is all the members as a group that have the right, power and authority to exercise full supervision and control. The third party has none. If a single member, like Life Savers, admits as it has that it did nothing as a member except to ship freight, it cannot be heard to complain if it is held responsible to a third party for charges on its own freight, shipped through Sentinel, on a per se agency basis arising out of Sentinel's *de facto* status as an exempt shippers association.

Life Savers relies on decisions such as *Consolidated etc. v. Admiral*, 442 F.2d 56 (CA 7, 1971) to argue that Metro should be estopped from advancing its claim, both because the shipping documents indicated that the charges were "prepaid", and because Metro allowed Sentinel to become delinquent and continued to render services, without calling Sentinel's delinquency to the attention of Life Savers when the situation first came to Whiteside's attention in December, 1979.

*Consolidated etc. v. Admiral*, is one of a group of cases in both federal and state courts which have allowed persons, otherwise liable for transportation charges, to raise such defenses. Those cases distinguish *Pittsburgh etc. v. Fink*, 250 U.S. 577,

40 S.Ct. 27, 63 L.Ed. 1151 (1919) on the theory that *Fink* barred estoppel because to do so would make such a defense the means of successfully avoiding the requirement of the act as to equal rates (neither discriminatory nor preferential).

In New Jersey, the main decision applying *Fink* is *Southern Pacific v. Wheaton Brass*, 5 N.J. 594, 76 A.2d 890 (1950), *cert. den.*, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951). That case was distinguished, as *Fink* was distinguished, on the theory that where the charges were correct, and neither discriminatory nor preferential, the purpose of *Fink* to bar evasion of one of the main purposes and policies of the Act was not involved. See *Penbrook etc. v. Sovereign, etc.*, 128 N.J.Super. 179, 319 A.2d 277 (Law, 1974); *Checker etc. v. Siltek, etc.*, 169 N.J.Super. 102, 404 A.2d 333 (App.1979).

The opinion in *Penbrook* classifies the illustrative cases, noting that in "undercharge" cases the defense is not allowed, following *Fink* and *Wheaton Brass*, while in cases not involving undercharge, the defense is allowed.

There is, however, a division on this point among federal and state jurisdictions, and the conflict has not been resolved by the Supreme Court. An opportunity to resolve the conflict was presented by the petition for certiorari in *Brown Transportation Corp. v. Atcon, Inc.*, 439 U.S. 1014, 99 S.Ct. 626, 58 L.Ed.2d 687 (1978), a case from the Georgia courts, but certiorari was denied. The dissent of Mr. Justice White, with whom Mr. Justice Blackmun joined, shows that the petition squarely presented the conflict among jurisdictions as between *Fink* and *Consolidated etc. v. Admiral*, with particular note of Judge Swygert's dissent in the latter.

No decision has been found in this Circuit, either at the District or Court of Appeals level, indicating a position on one side or the other of this conflict, though New Jersey has evidently followed *Consolidated etc. v. Admiral*, at least through the Appellate Division level.

As this court sees the issues of law, there is no need in this case to select one or the other position, for the reason that in this case there is a *de facto* shippers agent, Sentinel, and not a freight forwarder, as in *Consolidated etc. v. Admiral*. This fact necessarily means that the undercharge issue is inevitably involved, and so the rationale of *Fink* must control. The reason for this is that Life Savers (and other members of Sentinel) necessarily obtained the benefits of the lower rates applicable to shipments in carload lots or in volume, by reason of their membership in Sentinel and of the *de facto* status of Sentinel as an exempt shippers association acting inevitably as agent for each member for that member's freight. To go behind the *de facto* status of Sentinel, in and of itself, in order to establish a lack of *de jure* status would consequently mean that the carriers involved undercharged the members by applying carload and volume rates to which they were not entitled. This would provide a means for achieving what *Fink* ruled should not be allowed.

Protection of the major purpose and policy to forbid anything but equal rates can only be achieved by placing the burden and obligation to insist on and see to Sentinel's compliance with the criteria for exemption on the only persons in a position to do so, namely the members.

Holding the members responsible to third parties, without insulation, for obligations incurred on their behalf on their own shipments by their agent Sentinel, is the only rule likely to induce and motivate members to carry out their own duties and obligations. Any attempt to shift the loss to the outside third party can only encourage evasion through the formation of pretended shippers associations.

These fundamental concepts have particular force in the field of freight charges. The tariffed and regulated carrier must be paid, and must be paid in full according to the tariff rates. An agreement to take less will not bar recovery of the whole claim. See, *American Export Lines v. J & J Distributing Co.*, 452 F.Supp. 1160 (D.N.J.

1978), especially footnote 3 referring to *Southern Pacific Co. v. Miller*, 454 F.2d 357 (CA 3, 1972) as to rail rates.

What Sentinel did with the funds supplied by Life Savers is not known, nor can it affect the outcome here. There are many ways in which shippers' associations may be provided by their members with working funds. Whatever the method, having authorized Sentinel to make contracts on its behalf as principal and beneficial owner of the goods shipped, Life Savers must carry the risk of loss if the agent misapplies the funds. The duty of loyalty and the obligation to account runs from the agent to the principal, not from the third party to the principal. See *Campagna v. U. S.*, 474 F.Supp. 573, especially at 585–586 (D.N.J., 1979).

▮ Insofar as Life Savers claims the defense of laches, this imposes no bar to the motion. Laches may provide a defense to equitable claims, but the claim here is one at law for which the statute of limitations has not run.

Insofar as Life Savers asserts the defense that Metro was negligent in allowing the charges to mount, the defense is meaningless at law. Life Savers, as principal, had the power and authority to supervise and control the conduct of its own agent, Sentinel. In fact, as the depositions show, Life Savers made no effort at all to control its agent but acted as though the agent were an independent contractor, which it could not be if Life Savers were to reap the benefits of shipping through Sentinel as a shippers' association.

Finally, as to the $41,573. that Life Savers admits it has not paid to Sentinel (the assignee for creditors evidently says the amount is larger), the existence of claims by Metro and Sentinel's assignee provides no ground for denying Metro's claim.

▮ If Life Savers felt itself exposed to dual liability for the shipments on which it has paid no one (whatever the amount might be), it could have filed a counterclaim for interpleader, or in the nature of interpleader, to bring the assignee before the

court on that segment of the suit. Interpleader is one of the very few forms of relief for which the federal courts may provide a remedy and serve process anywhere in the nation. See *Watson v. Manhattan & Bronx, etc.*, 487 F.Supp. 1273, at 1276–1277 (D.N.J.1980), and 28 U.S.C. § 2361.

Having failed to seek interpleader relief, there is no genuine issue of fact on the motion before the court, and Metro is entitled to judgment as a matter of law.

Submit order accordingly.

### Supplemental Opinion

BIUNNO, District Judge.

After ruling that plaintiff was entitled to summary judgment (Memorandum of July 25, 1980), plaintiff submitted a form of order, to which defendant raised objections. Under date of August 5, 1980, the court signed a memorandum to deal with the objections raised, attaching the letters from both sides for the record.

The various courses laid out by the memorandum of August 5 did not bring the parties to agreement as to the form of judgment. Plaintiff submitted one form with its attorney's letter of August 22, 1980, and defendant submitted another with its attorney's letter of August 27, 1980. Plaintiff's attorney says he understood defendant had no objection to the ordering paragraphs he submitted, but wished to have additional paragraphs (described to him) to which he objected. These letters and drafts are attached for the record.

The matters of difference are listed below.

1. *Principal sum.* This was dealt with by the Memorandum of August 5, 1980. The complaint sought liquidated damages of $251,253.96, while the invoices authenticated by affidavit showed a total of $256,624.65, which gives $5,370.69 as the difference.

When the motion was argued on July 15th, the court asked the defendant whether there was any dispute about the amounts shown by the invoices (a bulky three-volume exhibit), and was told there was none. The court gathered from this that all the invoices were for shipments made by Life Savers through Sentinel, that Metro had not been paid for them, and that the total was as shown by the moving affidavits. This meant that the only issue to be resolved was that of liability, and the ruling of July 25, 1980 was directed to that issue.

When Metro submitted its first draft order, it properly suggested that the complaint be amended to conform the principal sum to the proofs. This is in accordance with F.R.Civ.P. 15(b), which allows amendments to the pleadings so that they will conform to the proofs, even after judgment. It is also in accordance with F.R.Civ.P. 54(c), second sentence, which requires a final judgment to grant the relief to the party in whose favor it is rendered is entitled, even if that relief was not demanded in the pleadings.

Since Life Savers opposed the suggested amendment, and since it did not appear that the *amount* was disputed as such, the August 5, 1980 memorandum suggested that the parties file a simple stipulation to make this correction of record.

Life Savers' August 27th letter says that it will not stipulate that the principal amount claimed by Metro is $256,624.65 as reflected in the moving papers. Instead, it said its order sets forth "only the facts to which it can agree—that the source and basis of the amount claimed by plaintiff is the invoices contained in Mr. Whiteside's affidavit and that the sum of those invoices is $256,624.65."

This position is outright quibbling. The amount was established by the moving proofs on the motion for summary judgment, and no fact issue was raised about the invoices or their total. The court asked the question it did at the hearing so that it would know whether the only issue was liability, and the response given confirmed that. In fact, as the record of the hearing on June 9th will show, Life Savers claimed a need for time to review the invoices as the primary reason for seeking adjournment. The time for a party to present facts to show the existence of a genuine issue on

a material fact is when that party files its affidavits and other proofs in response to the motion for summary judgment, not on the settlement of the order after ruling.

Even now, Life Savers does not say that it challenges any of the invoices submitted with the Whiteside affidavit, as by saying that it was not for a Life Savers' shipment through Sentinel, or that the amount is not in accordance with Metro's arrangement with Sentinel, or that Metro had in fact been paid.

Under these circumstances, the court concludes that Life Savers' position is not taken in good faith, and that its only effect is to cause delay. The order will provide for amendment of the complaint to conform to the undisputed evidence, and will set the principal sum at the amount so shown.

There ought not to have been any difficulty in arriving at a stipulation. Even now, Life Savers agrees that the larger sum is the amount shown by the invoices. It protests that it does not agree that it owes Metro anything, but it was not asked to agree to liability; it was asked only to stipulate that if there be liability (an issue ruled on by the court), the correct amount was the larger sum.

2. *Prejudgment interest.* As a condition to the adjournment sought by Life Savers, the court required that it advance to Metro the amount claimed in the complaint (the lesser figure of $251,253.96), together with interest at 18% from April 11, 1980, the date the complaint was filed, to June 12, 1980, when the loan was to be made, on a loan receipt basis, and the court understands that this was done.

For purposes of the order, the court pointed out in its memorandum of August 5, 1980 that the formal and strict approach would require a calculation of prejudgment interest from the 8th day after each invoice, and set the realistic rate at 2% above the average prime rate in New York for each month, month by month.

In the period thus covered, the prime rate has varied considerably and frequently, at levels that can be called "high", "very high" and "exceptionally high." Since the process of calculation would be much more difficult than for a period when interest rates are stable, the court suggested that a rate of 18% be used, but only for the 62 days from April 11 to June 12, 1980. This seemed a practical solution, which Metro accepts but Life Savers insists on a provision in the order that "leaves no doubt" that Metro has waived any difference between the amount so calculated, and that which would result from a month-by-month calculation at varying rates.

This suggestion assumes that the calculated month by month interest would come to more. The court has no way of knowing this without undertaking the calculation itself. Conceivably, the month-by-month method could result in a lesser aggregate interest amount.

Since Metro has chosen to accept the single rate of 18% for the limited period, the order will provide that Life Savers will have the opportunity to serve and file a calculation showing that the month-by-month method, as outlined in the August 5, 1980 memorandum, results in a smaller aggregate amount of interest, as a basis for amending the provision for prejudgment interest. Failing that, it will be taken that the interest so calculated would either be more, or so little different as not to be worth anyone's effort, especially since the net benefit and cost are affected by the taxability of interest as income, and its allowance as a deduction.

Using a 365 day year, the 62 day interest on $251,253.96 at 18% is $7,682.78; the interest on the additional $5,370.69, from April 11, 1980 to September 8, 1980, also on a 365 day year, comes to $397.28.

3. *The loan receipt and supersedeas-bond; stay of execution.*

These are matters which Life Savers presses to be included in the order. The court sees no reason to deal with these questions now. The ruling imposing a condition that funds be advanced on loan receipt carried no implication whatever about the financial soundness of Life Savers or its ability to satisfy a judgment. The court

has absolutely no information on the subject. Since nothing of this kind is implicit or has been found, the argument based on the contrary assumption is without foundation.

### 4. *Costs*

The General Rules of this District deal adequately with the taxation of costs by the clerk. They allow 30 days after judgment within which the prevailing party is to serve and file his Bill of Costs and Disbursements, with notice of motion when application will be made to the Clerk to tax them. General Rule 23A. If this is not done in that period, costs are taken as waived, General Rule 23D. No reason is seen why these provisions should be altered for this case.

### 5. *Order*

Since the parties have failed in two efforts to prepare an order to carry out the ruling dated July 25th, with agreement as to form, the court will draw it.

### APPENDIX

In the course of arriving at the ruling made, it was necessary to locate and examine various provisions of the Act and the regulations thereunder insofar as they apply to freight forwarders, who were first brought under I.C.C. regulation in 1942, 56 Stat. 284. These provisions, of course, do not apply to exempt shippers associations or shippers agents, but it is well to record them in order to display the contrast between regulation and exemption. Statute references are to the revised law, in effect throughout the period in suit.

*49 U.S.C. § 10561.* Brings freight forwarders under the jurisdiction of the I.C.C. (since 1942).

*49 U.S.C. § 10562.* I.C.C. does not have jurisdiction over specified types of service, some of which would otherwise be included in the services of a freight forwarder, including shippers associations, par. (3) and shippers agents in terminal areas, par. (4).

*49 U.S.C. § 10741.* Basic prohibition against discrimination in rendering transportation services; requires the same compensation for like and con-temporaneous service for a like kind of traffic under substantially similar circumstances. Applies to overcharges or undercharges. Certain activities declared to be unreasonable discrimination. Other activities declared not to be a violation.

*49 U.S.C. § 10743.* Subject to specified qualifications, generally allows carrier to surrender possession of freight only when payment for transportation is made.

*49 U.S.C. § 10744.* Lays down rules of liability for payment of rates for transportation of freight to a consignee other than one who is an agent only without beneficial title, and disclosure of name and address of beneficial owner. [NOTE: The documentation examined by the court indicates that Life Savers was both the originator and ultimate recipient of its shipments in this case].

*49 U.S.C. § 11901.* General civil penalties for violations by common carriers and other persons.

*49 U.S.C. § 11902.* Civil penalties for accepting rebates from common carrier.

*49 U.S.C. § 10903.* Criminal penalties for underrating, discriminating, failure to file and publish tariffs or to observe tariffs.

*49 U.S.C. § 10904.* Criminal penalties for rate and discrimination violations by common carriers and other persons, including "freight forwarders" subject to I.C.C. jurisdiction, par. (d)(1), and recipients, par. (d)(2).

*49 U.S.C. § 10914.* General criminal penalty for which specific penalty is not provided.

49 C.F.R. Part 1035 (1979). Regulations on bills of lading.

49 C.F.R. Part 1080 (1979). Contracts between freight forwarders and motor common carriers.

49 C.F.R. Part 1081 (1979). Freight forwarders to provide for issuance to shipper of through bills of lading.

49 C.F.R. Part 1083 (1979). Freight forwarder contracts for joint loading, ter-

minal services and facilities, required to be filed.

49 C.F.R. Part 1084 (1979). Surety bonds and insurance policies to be obtained and filed by freight forwarders.

49 C.F.R. Part 1085 (1979). Freight forwarders of household goods, including standard form and receipt to be supplied to prospective shippers with address and phone numbers for I.C.C. field offices.

49 C.F.R. Part 1090 (1979). Practices and tariffs for "trailer-on-flatcar" (TOFC) service.

49 C.F.R. Part 1150 (1979). Applications for permits to authorize operation of (regulated) freight forwarders, and notice to State of operation and competitors.

49 C.F.R. Part 1151 (1979). Transfers of freight forwarder permits, including leases.

49 C.F.R. Part 1200 (1979). General accounting regulations.

49 C.F.R. Part 1220 (1979). Classification of "A" and "B" freight forwarders; specific accounting and reporting requirements.

49 C.F.R. Part 1220 (1979). Regulations on preservation of records; includes freight forwarders.

49 C.F.R. Part 1251 (1979). Quarterly and annual reports of freight forwarders; filing.

49 C.F.R. Part 1252 (1979). Annual reports of piggyback carriers, including Class A freight forwarders, § 1252.5.

49 C.F.R. Part 1300 (1979). General regulations for freight tariffs.

49 C.F.R. Part 1309 (1979). Tariffs and classifications of freight forwarders.

49 C.F.R. Part 1320 (1979). Extension of credit to shippers by rail carriers. See § 1320.1 for specific reference to traffic of nonprofit shippers' associations and shippers' agents, with requirement to provide names of beneficial owners on bills of lading or by reference.

49 C.F.R. Part 1322 (1979). Extension of credit to shippers by motor carriers.

See § 1322.1 for parallel provision dealing with nonprofit shippers' associations and shippers' agents.

49 C.F.R. Part 1324 (1979). Settlement of freight charges by freight forwarders.