577 A.2d 1239

CLAIRE E. DEWEY, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF WILFRED E. DEWEY, DECEASED, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. R.J. REYNOLDS TOBACCO CO., DEFENDANT–INTERVENOR, AND R.J. REYNOLDS INDUSTRIES, INC., AMERICAN BRANDS, INC., (FORMERLY THE AMERICAN TOBACCO COMPANY, INC.), DEFENDANTS, AND BROWN & WILLIAMSON TOBACCO CORPORATION, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued January 18, 1989—Decided July 26, 1990.

*Martin London,* argued the cause for appellant and cross-respondent (*Norris, McLaughlin & Marcus,* attorneys; *William C. Slattery,* on the briefs).

*Peter N. Perretti, Jr.,* argued the cause for defendant-intervenor (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Peter N. Perretti, Jr.* and *Alan E. Kraus,* on the brief).

*Marc Z. Edell* argued the cause for respondent and cross-appellant (*Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade* and *Wilentz, Goldman & Spitzer,* attorneys; *Marc Z. Edell* and *Alan Darnell,* of counsel; *Marc Z. Edell, Alan Darnell,* and *Cynthia A. Walters,* on the briefs).

*Adam S. Henschel* submitted a brief on behalf of *amicus curiae,* Association of Trial Lawyers of America, New Jersey Chapter (*Greenberg & Prior,* attorneys; *William S. Greenberg,* of counsel; *William S. Greenberg* and *Adam S. Henschel,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This products-liability case poses two troubling questions: (1) whether the Federal Cigarette Labeling and Advertising Act, 15 *U.S.C.* §§ 1331–41 (1982 & Supp. III 1985) (hereinafter Cigarette Act), preempts plaintiff's claims, and (2) whether the recently-enacted New Jersey Products Liability Law, *N.J.S.A.* 2A:58C–1 to –7 (hereinafter Products Liability Law) is applicable retroactively and renders a surviving claim invalid as a matter of law. The Law Division entered an order of partial summary judgment in favor of defendant Brown & Williamson Tobacco Co. *Dewey v. R.J. Reynolds Tobacco Co.,* 216 *N.J.Super.* 347, 358, 523 *A.*2d 712 (1986). On the parties' interlocutory appeal and cross-appeal the Appellate Division affirmed. *Dewey v. Brown & Williamson Tobacco Co.,* 225 *N.J.Super.* 375, 542 *A.*2d 919 (1988). We granted both plaintiff's and Brown & Williamson's motions for leave to appeal, 113 *N.J.* 379, 550 *A.*2d

481 (1988). We now answer the two questions posed above in the negative.

## I

In 1982 plaintiff, Claire Dewey, individually and as executrix of her husband's estate, sued R.J. Reynolds Tobacco Co., R.J. Reynolds Industries, Inc., American Brands, Inc., and Brown & Williamson Tobacco Co. Plaintiff's complaint alleged that her husband had developed lung cancer from smoking defendants' cigarettes from 1942 until eight months before his death in 1980. Count one asserted general theories of design defect, including a claim of inadequate warning, and count two alleged theories of fraud and misrepresentation in advertising. Counts three and four were derivative.

During discovery, plaintiff disclosed that her husband had not smoked defendant Brown & Williamson's cigarettes ("Viceroy") until 1977, thirty-five years after he had started to smoke and eleven years after Congress had enacted the Cigarette Act, which requires that each package of cigarettes carry a warning of the alleged health hazards of smoking. See 15 *U.S.C.* § 1333. Brown & Williamson then moved for summary judgment on two grounds: (1) that the Cigarette Act preempted all of plaintiff's claims, and, alternatively, (2) that the complaint was deficient as a matter of New Jersey substantive law because comment i of Section 402A of the *Restatement of Torts (Second)* (hereinafter Restatement) bars the imposition of strict liability for a product "whose danger is contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics * * *."

The trial court dismissed so much of the first count of plaintiff's complaint as alleged liability for failure to warn, and the entire second count, which alleged fraud and misrepresentation in advertising, on the ground that the Cigarette Act preempts all those claims. 216 *N.J.Super.* at 355, 523 *A.*2d 712. That result was compelled, according to the court, by the Third

Circuit's interlocutory decision in *Cipollone v. Liggett Group*, 789 *F.*2d 181 (1986), *cert. denied*, 479 *U.S.* 1043, 107 *S.Ct.* 907, 93 *L.Ed.*2d 857 (1987), which held that the federal Cigarette Act impliedly preempted state-law damage actions that challenge "either the adequacy of the warning on cigarette packages or the propriety of a party's actions with respect to the advertising and promotion of cigarettes." 789 *F.*2d at 187 (footnote omitted). The Third Circuit reaffirmed its preemption decision in post-trial proceedings in *Cipollone v. Liggett Group*, 893 *F.*2d 541, 581–82 (1990), with Chief Judge Gibbons concurring "only because this panel is bound" by what he perceived as the court's previous "erroneous opinion." *Id.* at 583.

The trial court in this case, however, did not dismiss plaintiff's design-defect claim on preemption grounds. The court believed that "*Cipollone* made clear that the regulatory scheme of the [Cigarette] Act and the federal interest involved was not so pervasive as to preclude all tort remedies which a plaintiff in smoking and health-related litigation may have under state law." 216 *N.J.Super.* at 356, 523 *A.*2d 712. Plaintiff could pursue a design-defect claim by showing, under the "risk-utility" test for determining design defect, that the risks posed by cigarettes outweighed their utility. She did not have to prove the existence of an alternative, safer design. *Ibid.* The court made no mention of the impact of comment i of *Restatement* Section 402A on the claim that survived preemption.

The Appellate Division affirmed substantially for the reasons expressed by the trial court, subject to "such modifications as intervening law makes necessary," 225 *N.J.Super.* at 377, 542 *A.*2d 919. Specifically, the Appellate Division modified the trial court's decision regarding the design-defect claim by stating that the principles of comment i of the *Restatement* Section 402A were applicable to the case pursuant to *N.J.S.A.* 2A:58C–3a(2), the "defenses" section of the Products Liability Law. *Id.* at 385, 542 *A.*2d 919. Thus, the court had "no quarrel with defendant's proposition that plaintiff may not recover if a factfinder concludes that the death of her decedent was caused

in large measure from exposure to the danger inherent in all cigarettes, a danger acknowledged to be within his contemplation as an ordinary consumer." *Id.* at 386, 542 *A.*2d 919. However, that proposition did not compel a legal conclusion that there was no material issue of fact regarding defendant's ability " 'to minimize the unavoidable [*i.e.* inherent] dangers attendant to cigarette smoking.' " *Ibid.* (quoting 216 *N.J.Super.* at 358, 523 *A.*2d 712). Plaintiff was therefore entitled to present to a factfinder evidence regarding alternative design or, as the Appellate Division described it, evidence "concerning defendant's cigarettes as defendant designed them and decedent smoked them." *Ibid.* The Appellate Division then summarized its holding by stating that although "the jury should not be asked to compare the risks and utility inherent in cigarette smoking nor to make findings of fact concerning whether decedent was adequately warned of those risks, plaintiff should be permitted to go forward with her cause of action." *Id.* at 388, 542 *A.*2d 919.

In addition to granting plaintiff and Brown & Williamson leave to appeal, we allowed defendant R.J. Reynolds Tobacco Company to file a brief and appear as intervenor.

## II

Integral to our analysis is a preliminary determination of whether plaintiff's complaint states a claim for design defect. Although our Rules of Court require that "all pleadings must be construed liberally in the interest of justice, *R.* 4:5–7, a party's pleadings must nonetheless fairly apprise an adverse party of the claims and issues to be raised at trial." *Miltz v. Borroughs–Shelving,* 203 *N.J.Super.* 451, 458, 497 *A.*2d 516 (App.Div.1985); *see also Hewitt v. Hollohan,* 56 *N.J.Super.* 372, 377, 153 *A.*2d 371 (App.Div.1959) ("a vague complaint, full of generalities, frequently indicates that the pleader has not thought through his cause of action, and does not yet know precisely upon what theory he will present his case"). In *Miltz,*

for example, the allegation in a complaint that the plaintiff's injuries were proximately caused by the defendant's "failure to install stairs properly," 203 *N.J.Super.* at 458, 497 *A.*2d 516, was insufficient notice of a negligent-inspection theory of the case. In this case defendants similarly assert that they were not aware of plaintiff's claim for design defect until the summary-judgment motion because plaintiff's second amended complaint omitted the term "design defect."

Although the first count of the second amended complaint does not contain the words "design defect," the complaint does allege that defendants' tobacco products "were not reasonably fit, safe and suitable for human use at the time the products were placed in the stream of commerce"—the talismanic language of a strict-liability claim. *See Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 176, 406 *A.*2d 140 (1979). Immediately following the foregoing language, the complaint asserts that "Defendants *further* failed to warn the general public and/or Plaintiff's decedent of deleterious, toxic and hazardous nature of their products for numerous years," and that "[t]he unfitness, unsuitableness and unsafeness of the Defendants' products, *along with* the failure of the Defendants to warn and/or convey an adequate warning caused the Plaintiff's decedent to suffer serious, severe, disabling and permanent injuries and death * * *." (Emphasis added.) The quoted language suggests that plaintiff's complaint alleged two distinct categories of defects: one involving the unsuitability of the product for consumption, the other focusing on the warning label. Contrary to Brown & Williamson's claim, it was therefore apparent on the face of the complaint that plaintiff was asserting more than an inadequate-warning claim. Although more by way of facts regarding the design defect would have been enlightening, see *Rule* 4:5–2, we agree with the Appellate Division's finding that "[t]o the extent that plaintiff's complaint was deficient, the judge properly looked to the entire record, giving plaintiff every favorable inference," 225 *N.J.Super.* at 382 n. 5, 542 *A.*2d 919, and that the trial court had correctly

concluded that the complaint was sufficient to support a claim of design defect.

— A —

We turn to the issue of whether the federal Cigarette Act preempts any of plaintiff's common-law tort claims. Defendants contend that although the Appellate Division correctly affirmed the trial court's dismissal of plaintiff's inadequate-warning and fraudulent-advertising claims on preemption grounds, the court should also have held that the Cigarette Act preempts plaintiff's alternative design-defect claim. Plaintiff counters that dismissal, on the basis of preemption, of any of the theories alleged in her complaint would represent a misapplication of United States Supreme Court precedent.

Pursuant to the Supremacy Clause of the United States Constitution, article VI, clause 2, Congress may preempt state common law as well as state statutory law through federal legislation. *Chicago N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 *U.S.* 311, 325–26, 101 *S.Ct.* 1124, 1134, 67 *L.Ed.*2d 258, 270 (1981). The essential question for any preemption analysis is "whether Congress intended that the federal regulation supersede state law." *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n*, 476 *U.S.* 355, 369, 106 *S.Ct.* 1890, 1899, 90 *L.Ed.*2d 369, 382 (1986). That inquiry is simple enough when Congress has expressly defined the extent to which the statute preempts state law. *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 *U.S.* 293, 299, 108 *S.Ct.* 1145, 1150, 99 *L.Ed.*2d 316, 325 (1988). Preemption may nevertheless arise "by implication" when, for instance, "the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it," *Rice v. Santa Fe Elevator Corp.*, 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447, 1459 (1947), or when the "object sought to

be obtained by federal law and the character of the obligations imposed by it may reveal the same purpose." *Ibid.; see Exxon Corp. v. Hunt,* 97 *N.J.* 526, 532–33, 481 *A.*2d 271 (1984). And even in the absence of express language or implied congressional intent to occupy the field, state law may be preempted "to the extent that it actually conflicts with federal law." *Brown v. Hotel Employees Int'l Union,* 468 *U.S.* 491, 510, 104 *S.Ct.* 3179, 3185, 82 *L.Ed.*2d 373, 383 (1984). Examples of "actual conflict" include instances in which compliance with both state and federal regulations is physically impossible, *Florida Lime & Avocado Growers v. Paul,* 373 *U.S.* 132, 142–43, 83 *S.Ct.* 1210, 1217, 10 *L.Ed.*2d 248, 256–57 (1963), or in which state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 *U.S.* 52, 67, 61 *S.Ct.* 399, 404, 85 *L.Ed.* 581, 587 (1941).

Obviously, then, preemption often hinges "on * * * question[s] of statutory construction and interpretation." *Palmer v. Liggett Group,* 825 *F.*2d 620, 623 (1st Cir.1987); L. Tribe, *American Constitutional Law* at 479–97 (2nd ed.1988) (discussing preemptive effect of federal legislation on state action). That simple point poses a unique issue in this case, because New Jersey precedent appears to hold that state courts are bound by the federal courts' interpretations of federal statutes, *Southern Pac. Co. v. Wheaton Brass Works,* 5 *N.J.* 594, 598, 76 *A.*2d 890 (1950), *cert. denied,* 341 *U.S.* 904, 71 *S.Ct.* 614, 95 *L.Ed.* 1343 (1951), and because the Third Circuit has already determined that the Cigarette Act preempts failure-to-warn claims as well as claims challenging the content of cigarette advertising. *Cipollone v. Liggett Group, supra,* 789 *F.*2d at 187. Defendants contend that our task is merely to adopt the Third Circuit's reasoning in *Cipollone,* as did the trial court in this case. See 216 *N.J.Super.* at 355, 523 *A.*2d 712. That contention requires us to examine the logic underlying adherence to federal law on the meaning and effect of a federal statute.

In *Wheaton Brass Works, supra,* 5 *N.J.* 594, 76 *A.*2d 890, this Court resolved a dispute over freight charges under the Interstate Commerce Act. Although stating generally, and perhaps imprecisely, that the case required "consideration of the applicable provisions of the Interstate Commerce Act as construed by the federal courts whose decisions on federal problems are controlling," *id.* at 598, 76 *A.*2d 890, the Court was clearly referring to the binding nature of the United States Supreme Court cases and not of lower-federal-court cases. *See West Jersey & Seashore R.R. v. Lake & Risely Co.,* 105 *N.J.L.* 314, 316, 145 *A.* 336 (Sup.Ct.1929); Note, "Authority in State Courts of Lower Federal Court Decisions on National Law," 48 *Colum.L.Rev.* 943, 944–45 n. 15 (1948). Not since *Wheaton Brass* has this Court ever suggested that lower-federal-court decisions on the interpretation of federal statutes are binding as a matter of law. *But see Urban League v. Mayor of Carteret,* 170 *N.J.Super.* 461, 469, 406 *A.*2d 1322 (App.Div. 1979) (federal-court decisions on the interpretation of federal statutes are binding precedent), *rev'd on other grounds sub nom. Southern Burlington County N.A.A.C.P. v. Mount Laurel,* 92 *N.J.* 158, 456 *A.*2d 390 (1983). Indeed, in *State v. Coleman,* 46 *N.J.* 16, 214 *A.*2d 393 (1965), in which this Court declined to follow the Third Circuit's federal-constitutional analysis in *United States ex. rel. Russo v. New Jersey,* 351 *F.*2d 429 (1965), we stated generally that

when adjudicating federal questions, the state courts form an integral part of the national structure and that:

> In that capacity they occupy exactly the same position as the lower federal courts, which are coordinate, and not superior to them. There is no appeal from the state to the lower federal courts. Instead both are subject to the reviewing power of the Supreme Court, which furnishes the unifying principle. Decisions of a lower federal court are no more binding on a state court than they are on a federal court not beneath it in the judicial hierarchy.

[*Id.* at 37, 214 *A.*2d 393 (quoting Note, *supra,* 48 *Colum.L.Rev.* at 946–47).]

Neither *Coleman* nor the article quoted in *Coleman* distinguished between the binding effect of decisions involving constitutional interpretation and those involving statutory interpre-

tation. *See, e.g., Dewey v. Brown & Williamson Tobacco, supra,* 225 *N.J.Super.* at 378 n. 2, 542 *A.*2d 919. Consequently, we reject any such distinction, and clarify that in neither situation are the decisions of the lower federal courts "binding" *per se.*

■ Instead, the operative principle that informs the discussion is the principle of "judicial comity." Stated simply, lower-federal-court decisions in this area should be accorded due respect, particularly where they are in agreement. *See, e.g., State v. Norflett,* 67 *N.J.* 268, 286, 337 *A.*2d 609 (1975). By helping to ensure uniformity, judicial comity discourages forum shopping. Hence, starting with a brief review of the Cigarette Act, we undertake an independent analysis of the federal scheme.

– B –

Perhaps the most significant event that precipitated the Cigarette Act was the 1964 Surgeon General's Advisory Committee Report, which authoritatively concluded that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action." H.R.Rep. No. 449, 89th Cong., 1st Sess. 1, *reprinted in* 1965 "U.S.Code Cong. & Admin. News" 2350, 2351. Specifically, the report found that smoking was related to lung cancer, chronic bronchitis, emphysema, cardiovascular diseases, and cancer of the larynx. The report also concluded that "overwhelming evidence indicates that smoking—its beginning, habituation, and occasional discontinuation—is to a large extent psychologically and socially determined." *Id.* at 2357. Public response to the report was "immediate and vocal." *Palmer v. Liggett Group, supra,* 825 *F.*2d at 622. "[I]n a rush to protect and inform [their] citizens," several states adopted mandatory warning labels for cigarette packages. *Ibid.*

The Federal Trade Commission also responded to the Surgeon General's Advisory Committee report by immediately issu-

ing a notice of proposed rulemaking that would have required a warning to be placed both on packages of cigarettes and in all advertising. See *Banzhaf v. F.C.C.*, 405 *F.*2d 1082, 1089 (D.C. Cir.1968), *cert. denied,* 396 *U.S.* 842, 90 *S.Ct.* 50, 24 *L.Ed.*2d 93 (1969). Concerned about the potential maze of conflicting regulations, Congress intervened in 1965 to set up a uniform system of warning labels for cigarettes.

Among the significant provisions of the Cigarette Act is the statement of policy and purpose, which originally provided:

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

(1) The public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health. [15 *U.S.C.* § 1331.]

Changes to subsection (1) made in 1984 are not relevant to this appeal.

Section 1333 of the Cigarette Act prescribes the exact language to be placed on the warning label. The label required in the original 1965 enactment was: "Warning: The Surgeon General Has Determined That Cigarette Smoking May Be Dangerous To Your Health." 15 *U.S.C.* § 1333 (1965). That warning was subsequently strengthened in 1970 to read: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous To Your Health." 15 *U.S.C.* § 1333 (1970). A 1984 revision to that section requires four rotating warnings that specifically describe the hazards attendant to smoking. 15 *U.S.C.* § 1333 (1984). Thus, the tentative message of the 1965 warning has been replaced by stronger assertions of the dangers of smoking.

Also relevant is the Cigarette Act's preemption section, which provided originally that "no statement relating to smoking and health, other than the statements required by section 1333 of

this title, shall be required on any cigarette package." 15 *U.S.C.* § 1334. That preemption provision was amended in 1970 to include additional language:

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

– C –

Because we do not write on a clean slate, we briefly examine the slate as it comes to us, beginning with the Third Circuit's decision in *Cipollone v. Liggett Group, supra,* 789 *F.*2d 181. There the court began its analysis by upholding the district court's conclusion that the preemption provision contained in 15 *U.S.C.* § 1334 did not expressly preempt plaintiff's state common-law claims. *Id.* at 185. The court explained that although the preemption provision explicitly prohibits states and federal agencies from requiring any additional warning on cigarette packages, no language refers to the viability of state common-law claims. *Id.* at 185–86. That lack of express guidance, combined with the strong presumption against preemption where state police powers are involved, see *Maryland v. Louisiana,* 451 *U.S.* 725, 746, 101 *S.Ct.* 2114, 2128, 68 *L.Ed.*2d 576, 595 (1981), militated against a finding of express preemption. *Id.* at 186; *accord Roysdon v. R.J. Reynolds Tobacco Co.,* 849 *F.*2d 230, 234 (6th Cir.1988); *Palmer v. Liggett Group, supra,* 825 *F.*2d at 625.

Consequently, the court examined the principles of implied preemption. As a preliminary matter, the court observed that although informative, the "vast" legislative history of the Cigarette Act was not "wholly dispositive of the issue." 789 *F.*2d at 186. According to the court, the language of the statute was "itself a sufficiently clear expression of congressional intent," making resort to the Act's legislative history unnecessary. *Ibid.*

The Third Circuit focused first on the form of implied preemption commonly known as "occupation of the field." Although Congress clearly intended to occupy *a* field, as evidenced in both the preemption provision and the statement-of-purpose section of the Act, the court found that the scheme created is not " 'so pervasive' [n]or the federal interest 'so dominant' as to eradicate all of the Cipollones' claims." *Ibid.* The court was also unpersuaded that the object of the Act and the character of obligations imposed by it "reveal a purpose to exert exclusive control over every aspect of the relationship between cigarettes and health." *Ibid.* Critical to that finding was the need for a "restrained view" of Congressional intent to preempt the field, because plaintiff's tort action concerned "rights and remedies traditionally defined solely by state law." *Ibid.*

The *Cipollone* court then turned to the second form of implied preemption, termed "actual conflict," which occurs when state law creates "an obstacle to the execution of the full purposes and objectives of Congress." *Id.* at 187 (quoting *Hines v. Davidowitz, supra,* 312 *U.S.* at 67, 61 *S.Ct.* at 404, 85 *L.Ed.* at 587). According to the court, the Cigarette Act "represents a carefully drawn balance between the purposes of warning the public of the hazards of cigarette smoking and protecting the national economy." *Ibid.* Allowing state-law damage claims to proceed would "upset" that balance by effectively requiring manufacturers to change their warning labels. *Ibid.* Consequently, the Court concluded that the Cigarette Act preempts "state law damage actions relating to smoking and health that challenge either the adequacy of the warning on cigarette packages or the propriety of a party's actions with respect to the advertising and promotion of cigarettes." *Ibid.* (footnote omitted). In addition, it found that the Act preempts all state-law damage claims that necessarily depend on a duty to provide an adequate warning. *Ibid.*

The *Cipollone* rationale found favor with four federal circuit courts: the first, *Palmer v. Liggett Group, supra,* 825 *F.*2d

620; fifth, *Pennington v. Vistron Corp.*, 876 *F.*2d 414 (1989); sixth, *Roysdon v. R.J. Reynolds Tobacco Co., supra*, 849 *F.*2d 230, and eleventh, *Stephen v. American Brands*, 825 *F.*2d 312 (1987). There is a consensus, then, at least among federal courts, that the imposition of state tort liability for failure to warn would jeopardize the "delicate" balance of policies enumerated in the Cigarette Act. *See, e.g., Palmer v. Liggett Group, supra*, 825 *F.*2d at 626 ("[i]t is inconceivable that Congress intended to have that carefully wrought balance of national interests superseded by the views of a single state, indeed, perhaps a single jury in a single state"). The *Palmer* court stated that "[t]o permit the imposition of state common law actions into a well-defined area of federal regulation would abrogate utterly the established scheme of health protection as tempered by trade protection." *Ibid.*

It should be noted, however, that two of the federal circuit court opinions were reversals of lower-court decisions that had concluded that the Cigarette Act had no preemptive effect. See *Palmer v. Liggett Group*, 633 *F.Supp.* 1171 (D.Mass.1986), *rev'd*, 825 *F.*2d 620 (1st Cir.1987); *Cipollone v. Liggett Group*, 593 *F.Supp.* 1146, 1157–63 (D.N.J.1984), *rev'd*, 789 *F.*2d 181. Finding those lower-court decisions to represent the sounder position regarding preemption, the Minnesota Court of Appeals likewise rejected the preemption defense. *Forster v. R.J. Reynolds Tobacco Co.*, 423 *N.W.*2d 691 (1988), *rev'd*, 437 *N.W.*2d 655 (Minn.1989).

Specifically, the intermediate appellate court in *Forster* disagreed with the federal Circuit Courts' approach to preemption, concluding that the traditional presumption against preemption is "heightened" by the following four factors: (1) the Cigarette Act does not explicitly preempt state tort claims, *id.* at 696; (2) the matter involves the state police powers of protecting the health and safety of the public, *id.* at 696–98; (3) the legislative history of the Cigarette Act, which the Third Circuit completely disregarded in *Cipollone*, indicates that Congress did *not* intend to supersede the traditionally state-run area of tort com-

pensation, *id.* at 698–99; and (4) preemption, given its drastic consequences, would effectively eliminate all means of recourse for the plaintiff. *Id.* at 700. The court concluded that "at the very heart of our ruling is the firm conviction that if there is a need to immunize the tobacco industry from tort liability, that decision must be made by Congress in an unambiguous mandate and *not* by the courts." *Id.* at 701.

Like the trial-court decisions in *Cipollone* and *Palmer,* the Minnesota Court of Appeals decision in *Forster* was eventually reversed on appeal. 437 *N.W.*2d 655. The reason for the reversal, the Minnesota Supreme Court explained, was that the imposition of state tort damages for failure to warn "would directly conflict with one of the announced purposes of the Act, namely, to avoid 'diverse, nonuniform, and confusing' regulations relating to cigarette smoking and health, and would effectively dismantle the federal plan." *Id.* at 659.

–D–

█ In deciding the preemption issue, we first point out that "the settled mandate" governing preemption of matters traditionally under state supervision "is not to decree such a federal displacement 'unless it was the clear and manifest purpose of Congress.'" *Florida Lime & Avocado Growers v. Paul, supra,* 373 *U.S.* at 146, 83 *S.Ct.* at 1219, 10 *L.Ed.*2d at 259 (quoting *Rice v. Santa Fe Elevator Corp., supra,* 331 *U.S.* at 230, 67 *S.Ct.* at 1152, 91 *L.Ed.* at 1459). Stated differently, "we are not to conclude that Congress legislated the ouster of [traditional common-law remedies] in the absence of an *unambiguous* congressional mandate to that effect." *Id.* 373 *U.S.* at 146–47, 83 *S.Ct.* at 1219, 10 *L.Ed.*2d at 159 (emphasis added); *see, e.g., Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 *U.S.* 707, 715, 105 *S.Ct.* 2371, 2376, 85 *L.Ed.*2d 714, 722 (1985) (presumption exists that state and local regulation of health and safety matters can constitutionally coexist with federal regulation); *Hines, supra,* 312 *U.S.* at 75,

61 *S.Ct.* at 408, 85 *L.Ed.* at 591 (Stone, J., dissenting) (courts must adequately "safeguard against * * * diminution of state power [founded on] vague inferences as to what Congress might have intended if it had considered the matter"); *MacGillivray v. Lederle Laboratories,* 667 *F.Supp.* 743, 745 (D.N.M. 1987) ("[i]t would be rare indeed to infer an intent to supersede tort actions involving rights and remedies traditionally defined exclusively by state law"); Sunstein, "Interpreting Statutes in the Regulatory State," 103 *Harv.L.Rev.* 405, 417 (pointing to "shared understandings about the limited preemptive effect of federal enactments").

The preemption arguments advanced by defendants are premised not on a clear showing of congressional intent but rather on dubious inferences and assertions. We agree with those courts that hold that the Cigarette Act neither expressly preempts common-law remedies nor impliedly preempts those remedies by pervasively occupying the field of law. Nor is there any indication that compliance with both state and federal law is impossible. *See Pennington v. Vistron Corp., supra,* 876 *F.*2d at 418–21; *Roysdon v. R.J. Reynolds Tobacco Co., supra,* 849 *F.*2d at 234; *Palmer v. Liggett Group, supra,* 825 *F.*2d at 625–26; *Cipollone v. Liggett Group, supra,* 789 *F.*2d at 185–87; *Forster v. R.J. Reynolds, supra,* 437 *N.W.*2d at 659–60. We part company, however, with the cited cases to the extent that they conclude that state-law claims for inadequate warning "actually conflict" with the purposes of the Cigarette Act.

Preemption by "actual conflict," as explained in *Hines v. Davidowitz, supra,* 312 *U.S.* 52, 61 *S.Ct.* 399, 85 *L.Ed.* 581, occurs in those instances in which, as a result of the operation of state law, "the purpose of the [federal] act cannot otherwise be accomplished—[ ] its operation within its chosen field else must be frustrated and its provisions be refused their natural effect * * *." *Id.* at 68 n. 20, 61 *S.Ct.* at 404 n. 20, 85 *L.Ed.* at 587 n. 20. In contrast to express and implied preemption, the "actual conflict" analysis is "more an exercise of policy choices

by a court than strict statutory construction." *Abbot by Abbot v. American Cyanamid Co.*, 844 *F.*2d 1108 (4th Cir.1988). The test is straightforward: first, a court must consider the purposes of the federal law, and second, it must evaluate the effect of state law on those purposes. *Finberg v. Sullivan*, 634 *F.*2d 50, 63 (3rd Cir.1980). Actual conflict must be more than "hypothetical" or "potential." *Rice v. Norman Williams Co.*, 458 *U.S.* 654, 659, 102 *S.Ct.* 3294, 3299, 73 *L.Ed.*2d 1042, 1049 (1982).

The Cigarette Act's statement of policy and purpose announces two separate goals: (1) "to adequately inform[ ] [the public] that cigarette smoking may be hazardous to health by [the] inclusion of a warning to that effect on each package of cigarettes," and (2) to protect "commerce and the national economy * * * to the maximum extent *consistent* with this declared policy [by] not imped[ing it with] diverse, nonuniform, and confusing cigarette labeling and advertising regulations." 15 *U.S.C.* § 1331 (emphasis added). It is significant that the second goal, the protection of trade and commerce, must be achieved "consistent with" and not "to the detriment of" the first and principal goal—to inform the public adequately that cigarettes may be hazardous to health. H.R.Rep. No. 449, 89th Cong., 1st Sess. a, *reprinted in* "1965 U.S.Code Cong. & Admin.News" 2350 (noting that the Act's "principal purpose" was to "provide adequate warning to the public of the potential hazards of cigarette smoking by requiring the labeling of cigarette packages with the [warning]"). Moreover, the secondary goal focuses on the need for uniform labeling and advertising *regulations* as a way of protecting commerce and the national economy, but does not go so far as to restrict the rights of injured consumers.

The question here is whether state common-law tort remedies will have the effect of creating "an obstacle to the accomplishment and execution of [those] purposes." *Hines, supra,* 312 *U.S.* at 67, 61 *S.Ct.* at 404, 85 *L.Ed.* at 587. It is clear that the allowance of such remedies will further, not impair, the goal of

adequately informing the public of the risks of cigarette smoking. It is instead the second federal goal—the protection of trade and commerce through uniform regulations—that according to defendants will be thwarted if tort claims are allowed to proceed. Specifically, defendants contend that the practical effect of a tort damage award is that it "imposes" a "requirement" on the manufacturer to change its warning label from the one federally prescribed, because "[o]nce a jury has found a label inadequate under state law, and the manufacturer liable for damages for negligently employing it, it is unthinkable that any manufacturer would not immediately take steps to minimize its exposure to continued liability." *Palmer v. Liggett Group, supra,* 825 *F.*2d at 627–28. According to defendants, preemption occurs because the incidental regulatory pressure exerted by a jury verdict would necessarily conflict with the goal of uniform regulations.

In other contexts the United States Supreme Court has commented on the regulatory effect of state damage actions. For example, in holding that the provisions in the National Labor Relations Act preempted a state common-law action for business losses associated with union picketing, the Court stated:

Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy * * *.

[*San Diego Trades Council v. Garmon,* 359 *U.S.* 236, 246–47, 79 *S.Ct.* 773, 780, 3 *L.Ed.*2d 775, 784 (1959).]

The quoted language has limited applicability, however, in view of the presumption in favor of federal preemption where the National Labor Relations Board (NLRB) is involved. *Brown v. Hotel Employees, supra,* 468 *U.S.* at 502, 104 *S.Ct.* at 3185, 82 *L.Ed.*2d at 384. The *Garmon* Court was also concerned that the primary jurisdiction of the NLRB would be impaired if

litigants were permitted to sidestep its remedial scheme by pursuing state-law claims.

More recently in *Silkwood v. Kerr–McGee Corp.*, 464 *U.S.* 238, 104 *S.Ct.* 615, 78 *L.Ed.*2d 443 (1984), the United States Supreme Court decided that the Atomic Energy Act, 42 *U.S.C.* §§ 2011–2284 (1982 & Supp. III 1985), did not preempt a state-authorized award of punitive damages even though the Act exclusively regulated the field of nuclear safety. In rejecting defendant's argument that the imposition of punitive damages would be tantamount to imposing a safety regulation, the Court stated:

> It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept. [Id. at 256, 104 *S.Ct* at 625, 78 *L.Ed.*2d at 457.]

*Silkwood* is relevant because it suggests that Congress may be willing to tolerate the regulatory consequences of the application of state tort law even where direct state regulation is preempted. *See, e.g., Goodyear Atomic Corp. v. Miller*, 486 *U.S.* 174, 186, 108 *S.Ct.* 1704, 1712, 100 *L.Ed.*2d 158, 171 (1988) ("Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not"). And just this term, in *English v. General Electric Co.*, —— *U.S.* ——, 110 *S.Ct.* 2270, 110 *L.Ed.*2d 65 (1990), the Court held that a nuclear-plant employee's state-law claim for intentional infliction of emotional distress based on employer's alleged retaliatory firing for plaintiff's "whistleblowing" did not conflict with federal regulations or specific remedies of the Energy Reorganization Act, despite tangential effect on their purposes, and hence was not preempted by federal law. Both *Silkwood* and *English*, therefore, pose an obstacle to defendants' "actual conflict" analysis, which is premised solely on the assertion that Congress could never have intended to tolerate such tension. *See also Cipollone, supra,* 789 *F.*2d at 187 (because several Supreme Court opinions recognize the regulatory effect of state-law damage claims, see, *e.g., Garmon*,

*supra,* 359 *U.S.* 236, 79 *S.Ct.* 773, 3 *L.Ed.*2d 775, state-law claims arising under the Cigarette Act are *ipso facto* preempted). We refuse to accept that assumption as the foundation for an "unambiguous Congressional mandate" to preempt state common law.

Instead, in order to determine whether the goal of uniformity will be impaired, we prefer to scrutinize the actual extent to which state-law damage claims have a "regulatory effect". Although liability may indirectly provide incentives to change behavior, the form of such change is never dictated by a court unless, of course, it be by way of injunctive or declaratory relief. *Cipollone v. Liggett Group, supra,* 593 *F.Supp.* at 1154; *see also* Garner, "Cigarette Dependency and Civil Liability: A Modest Proposal," 53 *S.Cal.L.Rev.* 1423, 1454 (1980) ("a damages award * * * requires only payment—it is not an injunction requiring the defendant to incorporate into its advertising a fixed legend different from the federally required label"). In this case a manufacturer that incurs a judgment of liability may change its conduct by (1) adding an additional warning (which would not be barred under the Cigarette Act because the preemption section provides that no statement shall be "required," hence, there is no prohibition against a manufacturer "voluntarily" saying more); or (2) placing a package insert in the product, as has been done with a multitude of products; or (3) simply choosing to do nothing and risking exposure to liability. "The decision * * * to choose whichever path is most prudent—is up to the industry. In either case, as long as it continues to meet the requirements of Federal law, it is free to meet its state-imposed obligations to its customers as it sees fit." Tribe, "Federalism With Smoke and Mirrors," *The Nation,* June 7, 1986, at 788. Defendants overstate the regulatory pressure that state-law damage claims would generate.

More significantly, defendants' analysis completely ignores the fact that state-tort claims advance a substantial goal apart from regulating behavior: to provide compensation to those injured by deleterious products when that result is consistent

with public policy. *See, e.g., Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 461, 479 *A.*2d 374 (1984) ("[T]here is a strong state interest in compensating those who are injured by a manufacturer's defective products"); *O'Brien v. Muskin Corp.,* 94 *N.J.* 169, 179, 463 *A.*2d 298 (1983) (strict liability is premised on a shared concern about allocating the risk of loss on those in the stream of commerce for injuries sustained from unsafe products); *Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 173, 406 *A.*2d 140 ("Strict liability * * * is but an attempt to minimize the costs of accidents and to consider who should bear those costs"). That goal was similarly iterated in *Ferebee v. Chevron Chemical Co.,* 736 *F.*2d 1529, *cert. denied,* 469 *U.S.* 1062, 105 *S.Ct.* 545, 83 *L.Ed.*2d 432 (1984), in which a worker alleged that Chevron, despite compliance with the labeling requirements of the Federal Insecticide Fungicide and Rodenticide Act, 7 *U.S.C.* § 136–136y ("FIFRA"), had failed adequately to warn that long-term skin exposure to paraquat could cause serious lung disease. In response to Chevron's argument that FIFRA preempts state tort suits for inadequate warnings, the court found that state tort law "may have broader compensatory goals" than the federal scheme, and that

> even if the ultimate purposes of federal and state law in this area are the same, a state (acting through its jurors) may assign distinct weight to the elements which go into determining whether a substance as labelled is of sufficient net benefit as to warrant its use. * * * [Thus] a state may choose to tip the scales more heavily in favor of the health of its citizens than EPA is permitted to by FIFRA. [736 *F.*2d at 1540.]

In rejecting Chevron's contention that the exclusive "regulatory aim" of FIFRA would be frustrated by state damage actions, the court stated:

> Damage actions typically, however, can have *both* regulatory and compensatory aims. Moreover, these aims can be distinct; it need not be the case, as Chevron apparently assumes, that the company can be held liable for failure to warn only if the company could actually have altered its warning. * * * In this case, a Maryland jury found that the EPA-approved label did not sufficiently guard against certain injuries. Even if Chevron could not alter the label, Maryland could decide that, as between a manufacturer and an injured party, the manufacturer ought to bear the cost of compensating for injuries that could

have been prevented with a more detailed label than that approved by the EPA. That is, Maryland can be conceived of as having decided that, if it must abide by EPA's determination that a label is adequate, Maryland will nonetheless require manufacturers to bear the risk of any injuries that could have been prevented had Maryland been allowed to require a more detailed label or had Chevron persuaded EPA that a more comprehensive label was needed. [Id. at 1541 (emphasis added).]

Similarly, in this case, a New Jersey jury could decide that a cigarette manufacturer, rather than an injured party, ought to bear the cost of injuries that could have been prevented with a more detailed warning label than that required under the Cigarette Act. *Cf. Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 238 n. 1, 432 *A.*2d 925 (1981) (explaining different approaches in inadequate-warning cases). We think that our citizens are entitled at least to the opportunity to present such a claim.

Like cigarettes, paraquat has been "extensively regulated since 1966 by the federal government." *Ferebee v. Chevron Chem. Co., supra*, 736 *F.*2d at 1532. The insecticide can be sold in the United States only when accompanied by a label approved by the EPA. *Id.* at 1539. Moreover, FIFRA contains a preemption section, which provides that a "State shall not impose or continue in effect any requirement for labeling * * * in addition to or different from those required under this subchapter." 7 *U.S.C.* § 136v(b). No doubt such a provision was intended to promote a similar goal of uniformity.

The *Ferebee* case prompts an additional observation: defendants' "implied preemption through incidental regulatory effect" analysis is equally applicable to the myriad of other federal labeling statutes and regulations that have as their foundation an express or implied goal of uniform labeling. The United States Food and Drug Administration (FDA), for example, prescribes warnings to be used on oral contraceptives to ensure that patients are "fully informed of the benefits and risks involved in the use of these drugs," 43 *Fed.Reg.* 4220 (1978); 21 *C.F.R.* § 310.501(a) (1984), and requires "precise and nationally uniform" labeling in that respect. 21 *C.F.R.*

§ 301.501(a)(2)(1) (1984). Defendants' analysis could just as easily apply to those regulations and thereby shield drug manufacturers from liability based on their compliance with labeling requirements, notwithstanding the fact that contraceptive users may not have been warned of the inherent risks of the product. Compliance with FDA labels on oral contraceptives, however, does not shield manufacturers from liability. *MacDonald v. Ortho Pharmaceutical Corp.*, 394 *Mass.* 131, 475 *N.E.*2d 65, 70 (1985).

Another analogous statute is the Federal Hazardous Substances Act (FHSA), 15 *U.S.C.* § 1261 et seq., which requires that hazardous household substances sold in interstate commerce have a label containing specific warnings and instructions. 15 *U.S.C.* § 1261(p), 1262, 1263. That Act provides that states may not establish or continue "a requirement applicable to such substance * * * unless such requirement is identical to the warning established pursuant to the Act." Pub.L. 94–284, § 17(a), 90 Stat. 510 (1976). Defendants' argument suggests that compliance with the FHSA would preclude a finding of negligence for failure to give additional warnings. The FHSA, however, prescribes only the minimum warning. It does not immunize the manufacturer of a hazardous product from failure to supply an adequate warning. *Burch v. Amsterdam Corp.*, 366 *A.*2d 1079, 1085 (D.C.1976).

Finally, defendants contend that the Cigarette Act preempts plaintiff's design-defect claims because those claims would necessarily disturb the balance struck by Congress between its concern for the health of Americans and for the health of the tobacco industry. We find no legislative or judicial support for the proposition that Congress engaged in its own risk-utility analysis and decided that cigarettes were not defectively designed.

We are persuaded by the view most forcefully stated by Solicitor General Kenneth Starr, in his unpublished monograph "The Law of Preemption," that "[o]ur federal system, with its

high regard for the several States' powers of governance, requires that judges not preempt state laws lightly." *Id.* at 61. Judge Starr recalls Justice Frankfurter's observation that when the Supreme Court considers whether the Congress has preempted state law, " '[a]ny indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority.' " *Id.* at 86 (quoting *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 *U.S.* 767, 780, 67 *S.Ct.* 1026, 1033, 91 *L.Ed.* 1234, 1249 (1947)). We are convinced that had Congress intended to immunize cigarette manufacturers from packaging, labeling, misrepresentation, and warning claims, it knew how to do so with unmistakable specificity.

We hold that the Cigarette Act does not preempt plaintiff's claims.

### III

We focus now on the second issue on this appeal, namely, whether the New Jersey Products Liability Law, which in *N.J.S.A.* 2A:58C–3a(2) provides a defense to manufacturers and sellers for harms caused by products whose dangerous propensities are known to the ordinary user, can retroactively insulate these defendants from liability for design defects inherent in their cigarettes.

New Jersey's tort-reform statute, which became effective after the trial court's decision in this case, was intended to "establish clear rules [in] actions for damages for harm caused by products, including certain principles under which liability is imposed and the standards and procedures for the award of punitive damages." *N.J.S.A.* 2A:58C–1. The Products Liability Law was not intended to "codify all issues relating to product liability, but only to deal with matters that require clarification." *Ibid.* The Products Liability Law leaves unchanged the three theories under which a manufacturer or seller may be held strictly liable for harm caused by a product—defective

manufacture, defective design, and defective warnings—as well as the definition of duty: "a manufacturer or seller of a product shall be liable * * * if the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." *N.J.S.A.* 2A:58C–2; *see Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 169, 406 *A.*2d 140.

The new statute, however, establishes new rules regarding the burden of proof and the imposition of liability. Those changes are not to be applied to products-liability actions instituted on or before the date of enactment, a category that includes this case. *L.*1987, *c.* 197, § 8. That provision reinforces the presumption in New Jersey favoring the prospective application of a statute, *Gibbons v. Gibbons,* 86 *N.J.* 515, 432 *A.*2d 80 (1981), as well as the requirement that "a statute [that] changes the settled law and relates to substantive rights is prospective only, unless there is an unequivocal expression of contrary legislative intent." *Pennsylvania Greyhound Lines v. Rosenthal,* 14 *N.J.* 372, 381, 102 *A.*2d 587 (1954). More importantly, it simplifies the issue of retroactivity because the only inquiry is whether section 3a(2) is a codification of existing common law or a "new rule" of strict tort liability for defective products. This Court's precedent persuades us that *N.J.S.A.* 2A:58C–3a(2) is a "new rule."

Section 3a(2) provides in part as follows:

a. In any product liability action against a manufacturer or seller for harm allegedly caused by a product that was designed in a defective manner, the manufacturer or seller shall not be liable if:

\*      \*      \*      \*      \*      \*      \*      \*

(2) The characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product that is an inherent characteristic of the product and that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended, except that this paragraph shall not apply to industrial machinery or other equipment used in the workplace and is not intended to apply to dangers posed by products such as machinery or equipment that can feasibly be eliminated without impairing the usefulness of the product.

■ The foregoing "hybrid" provision combines the "consumer expectations" doctrine for determining whether a product is defective, *see O'Brien, supra,* 94 *N.J.* at 182, 463 *A.*2d 298, with the obvious-danger factor of the risk-utility analysis, *see Campos v. Firestone Tire & Rubber Co.,* 98 *N.J.* 198, 206–07, 485 *A.*2d 305 (1984), to create a defense to a design-defect claim. In enacting that provision, the legislature drastically changed the method of analyzing products-liability cases. Specifically, the provision has overturned so much of our decisions in *Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 170–71, 406 *A.*2d 140, and *O'Brien v. Muskin Corp., supra,* 94 *N.J.* at 181–82, 463 *A.*2d 298, as endorsed the application of the "risk-utility" analysis when a plaintiff is unable to establish a defect under the "consumer expectations" test. That change is easily demonstrated by the trial court's opinion in this case, which relied on *O'Brien* to allow plaintiff's claim to proceed on a risk-utility theory irrespective of whether the "consumer expectations" test was satisfied:

> In *O'Brien,* the Supreme Court endorsed the use of risk-utility analysis since it "provides the flexibility necessary for an appropriate adjustment of the interests of manufacturers, consumers and the public." 94 *N.J.* at 183, [463 *A.*2d 298]. Moreover, the *O'Brien* court made clear that in a design-defect case containing a claim that a product is unavoidably unsafe, manufacturers cannot insulate themselves from liability merely by placing warnings on their products. [216 *N.J.Super.* at 357, 523 *A.*2d 712.]

Hereafter, under the Products Liability Law, the consumer-expectations test cannot be avoided in a claim for design defect.

■ Section 3a(2) also modifies the method of analyzing "obvious danger" as established in *Campos v. Firestone Tire & Rubber Co., supra,* 98 *N.J.* 198, 485 *A.*2d 305:

> Although some jurisdictions have adopted an "obvious danger rule" that would absolve a manufacturer of a duty to warn of dangers that are objectively apparent, in our state the obviousness of a danger, as distinguished from a plaintiff's subjective knowledge of a danger, is merely one element to be factored into the analysis to determine whether a duty to warn exists. [*Id.* at 207, 485 *A.*2d 305.]

Instead of representing a single factor in the analysis, "obvious danger" has now been transformed into a defense, except in

instances involving industrial machinery or other workplace equipment. See *Suter v. San Angelo Foundry & Mach. Co.*, *supra*, 81 *N.J.* at 160–68, 406 *A.*2d 140.

Defendant's argument that section 3a(2)'s adoption of *Restatement* Section 402A's comment i represents a mere codification of New Jersey common law, and hence is entitled to retroactive application, likewise must fall. Comment i defines the term "unreasonably dangerous" by stating that

> [m]any products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk or harm, if only from over-consumption. * * * That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.* * * * Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.

The "good tobacco" example included in comment i has never been adopted by this Court. Even though in *Cepeda v. Cumberland Engineering Co.*, 76 *N.J.* 152, 170, 386 *A.*2d 816 (1978), this Court stated in *dicta* that comment i

> explains that the qualification "unreasonably dangerous" was meant to negate the notion that products normally useful, such as sugar, whiskey, tobacco, or butter, could be regarded as defective because, if used improperly, excessively or in an adulterated condition, they could also be harmful,

the Court never embraced that proposition as a statement of New Jersey law. *See Suter, supra*, 81 *N.J.* at 187, 406 *A.*2d 140 (concurring opinion) (in *Cepeda* the Court's "definitional treatment of 'defective condition unreasonably dangerous' [did not] rest in any measure on Comments g and i of Rest.2d sec. 402A"). Moreover, the only element of comment i that appears to have survived *Suter* is the "consumer expectations" test itself. The language "defective condition unreasonably dangerous," which comment i was intended to define, has been struck from this State's legal vocabulary, *Suter, supra*, 81 *N.J.* at 175, 406 *A.*2d 140, because the terminology imposed an unwarranted "dual burden" on the plaintiff to prove both "defective condition" and "unreasonably dangerous." *Id.* at 175, 406 *A.*2d 140. That terminology seemed to suggest

that recovery in a products liability action should be permitted *only* if a product is more dangerous than that contemplated by the average consumer, [which would] permit the low esteem in which the public might hold a dangerous product to diminish the manufacturer's responsibility for injuries caused by that product. [*Barker v. Lull Eng'g Co., Inc.,* 20 *Cal.*3d 413, 425, 573 *P.*2d 443, 451, 143 *Cal.Rptr.* 225, 233 (1978)]

Indeed, if any trend is apparent, it is this Court's reluctance to adhere to the restrictive language in comment i's formulation of strict liability, which would of course include the "good tobacco" example.

As a last resort, defendants turn to the legislative history of the Products Liability Law to support its assertion that comment i in its entirety has been embraced by this Court. The Assembly Insurance Committee Statement to Senate, No. 2805, explains that

certain provisions of the act simply codify the existing common law of the State, which should continue to apply in pending cases as well as new cases. For example, section 2 states that the burden is on the claimant in a product liability action to prove by a preponderance of the evidence that the product is defective. This is the rule under the existing common law. *Similarly, the New Jersey courts have adopted certain provisions of the commentary to the American Law Institute's "Restatement (Second) of Torts," (e.g., comments i and k to section 402A) that are codified in this act.* (Emphasis added.)

Defendants add that even if the Assembly Insurance Committee was incorrect in its assessment of the common law, its statement must be construed as evidence of the legislature's intent that section 3a(2) apply to pending cases—an argument that the federal district court in *Cipollone* found persuasive, despite that court's conclusion that *N.J.S.A.* 2A:58C–3a(2) did not codify existing common law. See *Cipollone v. Liggett Group, supra,* 893 *F.*2d at 577.

Putting aside the legislature's interpretation of common law, the Assembly Insurance Committee Statement is not inconsistent with our position. Citing comment i as an example, it asserts that *certain* provisions in the *Restatement*'s commentary were adopted prior to the Products Liability Law. As previously discussed, in *Suter, supra,* 81 *N.J.* at 171, 406 *A.*2d 140, this Court did adopt comment i to the extent that it

encompassed the "consumer expectations" test. Because we read the Assembly Committee's Statement as no more than an acknowledgement of that fact, we do not find support for the assertion that a wholesale adoption of comment i is mandated by the Committee's innocuous reference.

Having concluded that section 3a(2) of the Products Liability Law does not codify existing common law, and hence is inapplicable, we are left with the remaining argument that as a matter of public policy this Court should immunize cigarette manufacturers from liability for the harm caused by their products by finding that no duty exists. *See, e.g., Cepeda v. Cumberland Eng'g Co., supra,* 76 *N.J.* at 173, 386 *A.*2d 816 ("before determining whether the case for liability should be given to the jury[,] the trial court should give consideration to whether a balanced consideration of factors did not preclude liability as a matter of law"). That argument has two premises: first, the public has long been aware of the health risks of smoking because of advocacy campaigns and the efforts of the United States Surgeon General. *See, e.g., Roysdon v. R.J. Reynolds Tobacco Co., supra,* 623 *F.Supp.* at 1192 (taking judicial notice of the widespread public understanding of the dangers inherent in smoking and concluding that plaintiffs did not make a *prima facie* case that cigarettes are defective), *aff'd,* 849 *F.*2d 230. *See generally* Crist & Majoras, "The 'New Wave' in Smoking and Health Litigation—Is Anything Really So New?," 54 *Tenn.L.Rev.* 551, 554–58 (arguing that the "long-term and widespread awareness" of the risks attributed to cigarettes precludes any finding that cigarettes are defective). Second, because consumers are aware of the risks of smoking, they are the cheapest cost-avoiders.

Defendants' argument completely ignores the extensive efforts of the tobacco manufacturers to saturate the public with information regarding the benefits of cigarette smoking, the aim of which is to rebut the assertions of public-health advocates and the Surgeon General. We note that in the ensuing quarter-century since the 1964 Surgeon General's Advisory

Committee Report, government interest in the societal cost and hazards of smoking has not abated. A bill recently introduced in Congress would provide for grants for advertisements to discourage smoking, the sponsor charging that "tobacco companies target[ ] women, teenagers and minority groups for their new products and advertising." New York Times, Feb. 21, 1990, at A18. Public opinion surveys as well as Federal Trade Commission reports suggest that the tobacco companies' efforts at rebuttal have been successful, thus raising a material issue of fact regarding consumer awareness of the dangers of smoking. Federal Trade Commission, *Report to Congress, Pursuant to the Federal Cigarette Labeling and Advertising Act,* June 30, 1967. We are unable, therefore, to decide that as a matter of public policy, manufacturers of cigarettes should be immunized from liability for the harms caused by their products. That decision is consistent with the general policy in New Jersey of "liberally favoring jury resolution of defectiveness issues * * * in products liability cases." *Huddel v. Levin,* 537 *F.*2d 726, 736 (3rd Cir.1976).

In sum, our decision today alters the Appellate Division decision by overturning the dismissal of plaintiff's failure-to-warn and misrepresentation claims, because we conclude that the Cigarette Act does not preempt such claims. We agree, however, with the Appellate Division's refusal to apply the "comment i" example relating to tobacco and with its decision to allow plaintiff's design-defect claim to proceed under the risk-utility analysis. We therefore refuse to apply *N.J.S.A.* 2A:58C–3a(2) retroactively to eliminate plaintiff's design-defect claim.

Judgment affirmed in part, reversed in part. We remand the cause to the Law Division.

ANTELL, P.J.A.D. (temporarily assigned), concurring in part, dissenting in part.

I respectfully dissent from the conclusion that the labeling requirement of the Federal Cigarette Labeling and Advertising

Act, 15 *U.S.C.A.* § 1333 (hereinafter "the Act"), does not preempt state court product liability actions based on claims of cigarette-caused injury to health that challenge the adequacy of manufacturers' warnings. I concur with the determination that the "obvious danger"/"consumer expectations" standard contained in the New Jersey Product Liability Act, *N.J.S.A.* 2A:58C–3a(2), is not applicable to cases such as this which were pending at the time of the statute's enactment. I also concur that the applicability of lower federal court decisions on the question of preemption must be made on principles of judicial comity and not *stare decisis.*

The majority correctly states that in the interpretation of federal statutes principles of comity dictate that lower federal court decisions "be accorded due respect, particularly where they are in agreement. [citation omitted]. Judicial comity helps to ensure uniformity and hence discourages forum shopping." From this posture the Court then undertakes its "independent analysis of the federal scheme," an inquiry in which it rejects the well-reasoned, unanimous determinations of the five federal Circuit Courts of Appeal and the Supreme Court of Minnesota which all conclude that Congress has preempted the question of adequate warnings concerning the use of cigarettes. So much for comity.

The Act's twofold concern is to inform the public of the health hazards posed by cigarette smoking without exposing "commerce and the national economy" to the confounding effects of "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 *U.S.C.A.* § 1331. Accordingly, at the time relevant to this case the Act mandated that this be accomplished by requiring that the following statement conspicuously appear on each package of cigarettes: "Warning: The Surgeon General Has Determined That Cigarette Smoking is Dangerous to Your Health." 15 *U.S.C.A.* § 1333.

15 *U.S.C.A.* § 1334 is entitled "Preemption." It provides

(a) No statement relating to smoking and health, other than the statement required by Section 1333 of this title, shall be required on any cigarette package.

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

The structure of the majority's holding merits close attention. It rests on the premise that the Act permits the states to compromise the federal goal of protecting commerce and the national economy in order to further inform the public about the hazards of smoking. Its rationale is that the protection of trade and commerce is a "secondary goal" because it "must be achieved 'consistent with' and not 'to the detriment of' the first and principal goal." Therefore, allowing challenges to the adequacy of warnings in state court proceedings does not conflict with the federal statute since its "principal goal" of adequately warning the public will be thereby better served.

As to the "secondary goal" of immunizing the cigarette industry from state regulation, the Court reasons that the impact of adverse jury verdicts based upon inadequate warnings constitutes only incidental regulatory pressure. Because "incidental regulatory pressure is acceptable, whereas direct regulatory authority [such as an injunction or declaratory relief] is not," the Act's prohibition against further regulation is not breached by challenges to the adequacy of warnings in state court product liability actions. The cigarette manufacturer, states the majority, is free to decide how it shall respond to such liability verdicts, that is, whether to modify the warnings or simply ignore the import of the verdicts.[1]

The other justification given for diminishing the protection Congress accorded commerce and the national economy is that

---

[1] A choice "akin to the free choice of coming up for air after being under water." *Palmer v. Liggett Group Inc.*, 825 F.2d 620, 627 (1st Cir.1987). The argument was there described as having been "disingenuously" maintained. *Ibid.*

it allows for the socially desirable objective of placing the risk of loss upon the one best able to bear it.

It can be seen that the Court's holding is vitally dependent upon its assumptions that under the Act one goal is subordinate to the other and that state courts may improve upon the warning statements required by Congress at the expense of commerce and the national economy. This is not what the Act says.

In limiting its attention to the statutory condition expressed in 15 *U.S.C.A.* § 1331 that protection of commerce and the national economy be "consistent with" the policy of adequate warnings, the Court overlooks the larger context of the declared congressional policy. 15 *U.S.C.A.* § 1331 states that policy "and the purpose of this chapter" to be the establishment of "a comprehensive Federal program to deal with cigarette labeling ... whereby" the public may be adequately informed and commerce may be protected. The word "whereby," relates to "Federal program." Thus, the Act itself creates the very "program ... whereby" commerce is given protection "to the maximum extent consistent with" warning the public. It not only sets forth the dual policy in the abstract, but also the bright-line warning language which forms the literal mechanics of its implementation. The preemption declaration of 15 *U.S.C.A.* § 1334 tells us that Congress wrote the language of the labeling requirement into 15 *U.S.C.A.* § 1333 to express its exclusive judgment as to how the competing values should be balanced. The Act leaves no doubt as to what warning should be given and how great an intrusion must be tolerated by commerce. Implicit in this is the conclusion that any attempted modification of that balance "under State law" would be in actual conflict with federal law. This is precisely the point of the federal circuit court decisions and the decision of the Supreme Court of Minnesota in *Forster v. R.J. Reynolds Tobacco Co.*, 437 *N.W.*2d 655 (1989), in applying the Act's preemption provision.

In *Palmer v. Liggett Group, Inc.*, 825 *F.*2d 620, 626 (1st Cir.1987), the Court noted that the Cigarette Labeling Act was passed after

"a hard-fought, bitterly partisan battle in striking the compromise that became the Act. It is inconceivable that Congress intended to have that carefully wrought balance of national interests superseded by the views of a single state, indeed, perhaps of a single jury in a single state.

It was there held "that a suit for damages on a common law theory of inadequate warning—if the warning given complies with the Act—disrupts excessively the balance of purpose set by Congress, and is thus preempted." *Ibid.* As the Supreme Court of Minnesota reasoned in *Forster, supra,*

The best indication of congressional intent, we think, is what Congress said in the statute. Congress said it wanted to avoid diverse, nonuniform, and confusing regulations. This statement of intent is at odds with plaintiffs' claim that Congress contemplated a diversity of conflicting state regulations coexisting with the federal regulatory scheme, or that Congress intended its warning to be a minimal warning to which a state could add further requirements. [*Forster,* 437 *N.W.*2d at 660] [Footnote omitted]

*See also Cipollone v. Liggett Group, Inc.*, 789 *F.*2d 181, 186 (3d Cir.1986) ("Even more important, we find the language of the statute itself a sufficiently clear expression of congressional intent without resort to the Act's legislative history.")

The majority states that the Act's "secondary" goal of protecting commerce "focuses on the need for uniform labeling and advertising *regulations* as a way of protecting commerce and the national economy, but does not go so far as to restrict the rights of injured consumers in achieving that goal." The emphasis on "regulations" is presumably used to suggest that the preemption provision is addressed solely to formal regulations promulgated by state administrative or legislative authority.[2] I disagree that Congress intended to shelter cigarette

---

[2]Although the word "regulations" is used in the Act's Declaration of Policy, 15 *U.S.C.A.* § 1331, the prohibition contained in 15 *U.S.C.A.* § 1334 is actually more broadly stated to extend to any requirements and statements relating to smoking and health "other than the statement required by section 1333 of this title." It should be noted that the preemption provision of § 1334(b) prohibits

manufacturers only from further governmental regulation but yet leave them answerable to multifarious claims of inadequate warnings limited only by the resourcefulness of counsel and expert witnesses. Such claims would expose the cigarette industry to more "diverse, nonuniform, and confusing cigarette labeling and advertising regulations" than could ever be expected from state governmental authority.

Moreover, claims of inadequate warning asserted in state court liability actions are pernicious in a sense not shared by governmental regulations. They are asserted after the fact, when compliance by the manufacturer is no longer possible to avoid the consequences of a particular suit. Regulations promulgated by state authority, once complied with, impose no duty on a manufacturer to respond in compensatory or punitive damages.

It is obvious that the congressional intent could not have been limited to protecting the industry from state regulatory action while leaving it open to the indirect regulation implicit in product liability suits based on claims of inadequate warning. Both have the proscribed regulatory effect. *San Diego Bldg. Trades Council v. Garmon,* 359 *U.S.* 236, 246–247, 79 *S.Ct.* 773, 780, 3 *L.Ed.*2d 775, 784, (1959). Although the majority relies upon *Goodyear Atomic Corp. v. Miller,* 486 *U.S.* 174, 186, 108 *S.Ct.* 1704, 1712, 100 *L.Ed.*2d 158, 171 (1988) for the proposition that "Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not," that decision more pertinently demonstrates that when Congress chooses to allow for "incidental regulatory pressure" it knows how to do so. It did not do so in this statute. As the Court said in *Cipollone v. Liggett Group, Inc.,* 789 *F.*2d at 187,

Applying this principle [that State law damage claims have a regulatory effect], we conclude that claims relating to smoking and health that result in liability

any further requirement "under State law." It did not limit itself to statutory law and is plainly intended to encompass judicial determinations.

for noncompliance with warning, advertisement, and promotion obligations other than those prescribed in the Act have the effect of tipping the Act's balance of purposes and therefore actually conflict with the Act.

*See also Roysdon v. R.J. Reynolds Tobacco Co.*, 849 *F.*2d 230, 234 (6th Cir.1988).

Furthermore, I can make no sense of a federal statute which would preclude state legislatures from requiring further minimal warnings, but allow private litigants to run riot with claims of inadequate warnings—claims which might never have come into existence if local lawmakers had been permitted to act in the first place. Had Congress intended to permit litigants to assert these claims on a case-by-case basis there would be no reason to prohibit state legislatures from requiring warnings, in addition to those specified by the Act, to protect consumers from the very injury for which they later sue.

Cases cited by the majority lend no support to its judgment that the Cigarette Labeling Act does not preempt product liability suits based on inadequate warning. In *Silkwood v. Kerr–McGee Corp.*, 464 *U.S.* 238, 104 *S.Ct.* 615, 78 *L.Ed.*2d 443 (1984), the Supreme Court decided in a five-four decision that a claim for punitive damages in an action for injuries resulting from the escape of nuclear radiation was not preempted by the Federal Atomic Energy Act of 1954, 42 *U.S.C.A.* § 2011 et seq. The case is distinguishable. First, unlike the Act herein, the Atomic Energy Act contained no preemption provision whatever. *Palmer v. Liggett Group, Inc.*, 825 *F.*2d at 628. Further, the federal legislation reserved significant regulatory authority to the State. *Ibid.* Also, the defendant there was in violation of the federal statute. Here, it is in compliance. In addition, whereas Silkwood was a hapless victim of the nuclear accident, here the decedent voluntarily exposed himself to the risks of smoking in the face of a federally prescribed warning that this would endanger his health.

Finally, in *Silkwood* the Supreme Court specifically found a clear congressional intent that state court tort remedies should remain available to those injured by nuclear incidents. Having

done so, it naturally concluded that since punitive damages "have long been a part of traditional state tort law," *Silkwood* 464 *U.S.* at 255, 104 *S.Ct.* at 625, 78 *L.Ed.*2d at 457, they were not preempted by federal law. It should be noted also that unlike jury verdicts which determine the adequacy of labeled warnings and therefore carry a regulatory impact, an award of punitive damages, which addresses a tortfeasor's state of mind and is given consideration only after liability has been determined, has no regulatory effect. In one case a standard is promulgated with which a defendant must comply. In the other, no such standard of performance is involved.

While it is true, as the majority states, that *MacDonald v. Ortho Pharmaceutical Corp.*, 394 *Mass.* 131, 475 *N.E.*2d 65 (1985), *cert.* den. 474 *U.S.* 920, 106 *S.Ct.* 250, 88 *L.Ed.*2d 258 (1985), decided that compliance with FDA labels on oral contraceptives does not shield manufacturers from liability, it appears that the label requirements in that case merely took the form of a regulation promulgated by the FDA Commissioner who "specifically noted that the boundaries of civil tort liability for failure to warn are controlled by applicable State law." *Id.* 475 N.E.2d at 70.

In *Ferebee v. Chevron Chemical Co.*, 736 *F.*2d 1529 (D.C.Cir. 1984), *cert.* den. 469 *U.S.* 1062, 105 *S.Ct.* 545, 83 *L.Ed.*2d 432 (1984), the Court found that plaintiff's claim of inadequate warning had not been preempted by the Federal Insecticide, Fungicide and Rodenticide Act, 7 *U.S.C.A.* § 136–136y ("FIFRA"), containing labeling requirements complied with by defendant manufacturer. The case differs from this in important respects. There, the federal act "clearly allow[ed] the states to impose more stringent constraints on the *use* of EPA-approved pesticides than those imposed by the EPA." *Ferebee*, 736 *F.*2d at 1541. (emphasis in original). Moreover, under that statute each manufacturer was required to submit to the EPA a warning label for each of the approximately forty thousand different herbicides and pesticide formulations covered by the statute for EPA approval. Thus, two manufacturers of the

same regulated product could use different labels so long as they were approved by the EPA. See *Palmer v. Liggett Group, Inc.*, 825 *F.*2d at 628–629, n. 13. The requirement for uniformity in labeling was not a subject of congressional concern and Congress had not taken the trouble, as it did here, to specify the precise warning required.

Finally, in *Burch v. Amsterdam Corp.*, 366 *A.*2d 1079 (D.C.Ct. of App.1976), plaintiff was injured in a flash fire when vapors from defendant's product were ignited by a kitchen stove pilot light. The label of the product was appropriately marked with warnings prescribed under the Federal Hazardous Substances Act, 15 *U.S.C.A.* § 1261(p)(1) (FHSA), which gave notice of its extreme inflammability. Although the Court held that the FHSA did not preempt a state court suit based on failure to warn, unlike the case here there was nothing in that statute from which federal preemption could be implied. The Court made no preemption analysis and stated that it could find "nothing in the statute itself or the legislative history which implies that Congress intended to limit a seller's common law 'duty to warn.'" 366 *A.*2d at 1085.

In my opinion, by allowing challenges to the adequacy of warnings on cigarette labels the Court is licensing a form of legal sanction forbidden by Congress. The federal legislation gives effect to the coordinate goals of protecting the public with minimal consequences to the cigarette industry. It does this by requiring that consumers be informed that cigarette smoking is "dangerous to your health," reflecting a judgment that this was all an ordinary consumer need know to appreciate the risk of smoking and drawing the line at which personal responsibility begins. Implicit in this choice of words is a recognition that the extent to which the warning can be particularized is infinite and that there are few cases of which it can be said that the manufacturer adequately covered the myriad risk possibilities about which a consumer could claim a warning should have been, but was not, given. Although Congress intended to put the matter to rest, the decision of the majority

allows for the very chaos which the Act attempts to resolve. Because this conflict breaches settled principles of federal preemption I would affirm the decision of the Appellate Division as to this issue.[3]

*For affirmance in part; for reversal in part; for remandment*—Justices CLIFFORD, HANDLER, O'HERN and STEIN, and Judges KING and COLEMAN—6.

*Concurring in part; dissenting in part*—Judge ANTELL—1.

---

[3]It is not amiss to note that offensive collateral estoppel has been applied in product liability cases to preclude a producer from denying the inadequacy of a warning found inadequate in a previous case in which the producer defended the claim against a different plaintiff. *Ezagui v. Don Chemical Corp.,* 598 F.2d 727 (2d Cir.1979); *Fraley v. American Cyanimid Co.,* 570 F.Supp. 497 (D.Colo. 1983). Although in *Kortenhaus v. Eli Lilly & Co.,* 228 N.J.Super. 162, 549 A.2d 437 (1982), the Appellate Division concluded that collateral estoppel would be unfair under the facts presented, its potential applicability in a failure to warn case was recognized. For general contours of the doctrine, see *Restatement, Judgments* 2d § 29 at 291 (1982). Its conceivable implication to a cigarette producer is that once its warning is found inadequate, it could be barred from re-litigating the issue in later suits brought by other consumers. Thus, dissolution of the "maximum" protection to which it is entitled would be complete, and the purpose of the federal program, as to that producer, would be nullified.